## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LISA TURRENTINE                          )
                                         )
      Plaintiff,                        )
                                         )
v.                                       )          Case No.:  08-CV-2042-JWL
                                         )
UNITED PARCEL SERVICE, INC.,             )
                                         )
      Defendant.                        )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THE MEYERS LAW FIRM, LC**

By:    /s/ Luke R. Hertenstein
       Martin M. Meyers       KS  #14416
       mmeyers@meyerslaw.com
       Andrew H. McCue     KS Fed. #78153
       amccue@meyerslaw.com
       Luke R. Hertenstein   KS #23809
       lhertenstein@meyerslaw.com
       222 W. Gregory Blvd.
       Suite 340
       Kansas City, Missouri   64114
       (816) 444-8500
       (816) 444-8508 *facsimile*

       ATTORNEYS FOR PLAINTIFF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

I.   STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.   PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT
          OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.   PLAINTIFF'S SATEMENT OF ADDITIONAL
          MATERIAL FACTS ("AMF") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


II.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     A.   SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

     B.   SEXUAL HARASSMENT/DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . . . 38

          1.   Rojas' Harassment of Plaintiff Was Based on Sex . . . . . . . . . . . . . . . . 39

          2.   Rojas' Harassment of Plaintiff Was Severe and Pervasive . . . . . . . . . . 41

          3.   There is a Basis for Imputing Liability to Defendant UPS . . . . . . . . . . 43

          4.   Conclusion for Sexual Harassment Claim . . . . . . . . . . . . . . . . . . . . . . . 46

     C.   RETALIATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

          1.   UPS Took Materially Adverse Actions Against Plaintiff . . . . . . . . . . . 47

          2.   There is a Causal Connection Between Plaintiff's Complaints About
               Sexual Harassment and UPS' Adverse Actions Against Plaintiff . . . . . . 55

          3.   UPS' Proffered Reasons for Its Adverse Actions Against Plaintiff
               Are Pretext for Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

          4.   Conclusion for Retaliation Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

     D.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

**TABLE OF AUTHORITIES**

**Cases**

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Aldrich v. Boeing Co.*, 146 F.3d 1265 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Ammon v. Baron Automotive Group*, 270 F. Supp. 2d 1293 (D. Kan. 2003) . . . . . . . . 42, 43, 44

*Anderson v. Coors Brewing Co.*, 181 F.3d 1171 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . 55, 57

*Argo v. Blue Cross and Blue Shield of Kansas, Inc*., 452 F.3d 1193 (10th Cir. 2006) . . . . . . . 59

*Bennett v. Emerson Elec Co.*, 160 F. Supp. 2d 1244 (D. Kan. 2001) . . . . . . . . . . . . . . . . . . . 38

*Bowers v. Bethany Medical Center*, 959 F. Supp. 1385 (D. Kan. 1997) . . . . . . . . . . . . . . . . . 38

*Burlington Northern and Santa Fe Ry. Co. v. White*,
    548 U.S. 53 (2006), 126 S.Ct. 2405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 48. 50, 51

*Butler v. City of Prairie Village*, Kan., 172, F.3d 736 (10th Cir. 1999) . . . . . . . . . . . . . . . . . 38

*Byle v. Anacomp, Inc*., 854 F. Supp. 738 (D. Kan. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Carrasco v. The Boeing Co.*,  2005 WL 1319051 (D. Kan. May 11, 2005) . . . . . . . . . . . . . 41, 42

*Flenker v. Willamette Industries, Inc*., 68 F. Supp. 2d 1261 (D. Kan. 1999) . . . . . . . . . . . . . . 38

*Holmes v. Utah, Dept. of Workforce Services*, 483 F.3d 1057 (10th Cir. 2007) . . . . . . . . . . . . 43

*Horsewood v. Kids R Us*, 27 F. Supp. 2d 1279 (D. Kan. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 38

*Jones v. Wichita State University*, 528 F.Supp.2d 1196 (D. Kan. 2007) . . . . . . . . . . . . . . . 39, 41

*Kennedy v. General Motors Corporation*, 226 F. Supp. 2d 1257 (D. Kan. 2002) . . . . . . . . . . 38

*Langley v. Adams County Colo.*, 987 F.2d 1473 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 38

*Lierz v. Coca Cola Enterprises, Inc*., 36 F. Supp. 2d 1295 (D. Kan. 1999) . . . . . . . . . . . . . . . 38

*Marx v. Schnuck Markets, Inc.*, 76 F.3d 324 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 38

*McClurg v. GTECH*, 61 F. Supp. 2d 1150 (D. Kan. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

i

*O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . 56, 59

*O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093 (10th Cir. 1999) . . . . . . . . . . . . 42

*Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75 (1998) . . . . . . . . . . . . . . . . . . . . 39

*Piercy v. Maketa*, 480 F.3d 1192 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Rahn v. Junction City Foundry, Inc.,* 161 F. Supp. 2d 1219 (D. Kan. 2001) . . . . . . . . . . 56, 57

*Randle v. City of Aurora*, 69 F.3d 441 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133 (2000) . . . . . . . . . . . . . . 37, 59, 60

*Romero v. Union Pac. R.R.*, 615 F.2d 1303 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.*,
     165 F.3d 1321 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Thiessen v. General Electric Capital Corp*., 267 F.3d 1095 (10th Cir. 2001) . . . . . . . . . . . . . 38

*Thompson v. General Finance Co.*, 468 P.2d 269 (Kan. 1970) . . . . . . . . . . . . . . . . . . . . . . . . 53

*Voltz v. Coca-Cola Enterprises Inc*., 2004 WL 100507 (10th Cir. 2004) . . . . . . . . . . . . . . . . 59

*Wirtz v. Kansas Farm Bureau Services, Inc.*, 274 F.Supp. 2d 1198 (D. Kan. 2003) . . . . . . . . 37

### Rules

F.R.E. 801(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

F.R.E. 805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| LISA TURRENTINE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No.:  08-CV-2042-JWL |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Lisa Turrentine states the following in opposition to Defendant's Motion for Summary Judgment.

**I.   STATEMENT OF MATERIAL FACTS**

Pursuant to ***Local Rule 56.1(b)***, Plaintiff sets forth below her responses to Defendant's Statement of Uncontroverted Facts and the Additional Material Facts on which this memorandum relies.

**A.   PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**STATEMENT OF UNCONTROVERTED FACTS**

1.   Undisputed.

2.   Disputed as incomplete.  While Plaintiff is not sure whether she bid on another route or not; she might have bid on a route and not gotten it.  **Deposition of Lisa Wilkerson ("Plaintiff Depo"), attached hereto as Ex. 1, 27:3-8.**

3.   Disputed in part.  Plaintiff does not dispute that UPS and the International Brotherhood of Teamsters ("Teamsters") have entered into collective bargaining agreements, and that such agreements impose duties and limitations on UPS and the Teamsters; however, Plaintiff disputes that any such contracts "govern the terms and conditions" of her employment with UPS

because she is not a party to any such contracts and is not a member of the Teamsters. **Plaintiff Depo, Ex. 1, 13:19-14:13.**

4.      Undisputed.

5.      Undisputed.

6.      Undisputed.

7.      Undisputed.

8.      Undisputed.

9.      Disputed in part.   Plaintiff does not dispute that Mike Bayers so testified; however, Plaintiff disputes that volume is low on Mondays. **Deposition of Ramon Conejo ("Conejo Depo"), attached hereto as Ex. 2, 30:16-31:18.**

10.      Disputed.   Plaintiff sometimes asked drivers for "a ride home," but no driver actually ever gave her a ride to her home; instead, drivers would sometimes give her a ride from the James Street facility to the place where her then-husband worked on the Plaza. **Affidavit of Lisa Wilkinson ("Plaintiff Affidavit"), attached hereto as Ex. 3, ¶ 1.**

11.      Disputed as incomplete.   Plaintiff does not dispute that she testified that Rojas did not make any inappropriate comments to her during the calls he made to her on his days off. Similarly, Plaintiff does not dispute that drivers do occasionally have legitimate business reasons to call another driver when they are working, such as to discuss their routes or to ask for assistance or to ask questions about a specific area.   However, it is both unusual and inappropriate for a driver, on his day off of work, to call and bother the driver covering his route; in such a situation, the driver off of work has no need to ask for assistance, because he is not working. **Plaintiff Depo, Ex. 1, 62:22-64:11; 65:2-24.**

12.     Disputed as incomplete.  Plaintiff does not dispute that she testified as described; however, defendant presents the statement without context.  On a day Rojas was off of work and Plaintiff was covering his route, Plaintiff encountered Rojas, and he told her that he had watched her deliver packages across the street.  When Plaintiff asked him why, Rojas said, "I was just seeing what you were doing, watching you . . . Maybe I can buy you lunch."  Plaintiff responded, "I have to finish my route," and went on about her day.  Plaintiff thought it was creepy that Rojas was standing there watching her deliver packages.  **Plaintiff Depo, Ex. 1, 51:6-52:24.**

13.     Disputed as incomplete.  Plaintiff does not dispute that she testified as described; however, defendant presents the statement without context.  Rojas told Plaintiff that he had a dream where she went to his wife's battered women's shelter with her kids and that, in his dream, he was the only one there to save and help her; Rojas told Plaintiff that she was lucky that he was there at the shelter for her.  In response, Plaintiff told Rojas he was "an asshole" and told him not to talk to her.  Plaintiff felt, *at the time*, that Rojas' comment was in reference to Plaintiff having been in an abusive relationship with her former husband.  **Plaintiff Depo, Ex. 1, 54:21-56:13 (*referencing* Complaint (Doc.1), ¶ 11(g)).**

14.     Undisputed.

15.     Disputed in part.  Plaintiff does not dispute that Ramirez, in her affidavit, denies Rojas said "anything derogatory" to her about Plaintiff; however, the affidavit does not confirm or deny Rojas making comments to her regarding Plaintiff's relationships.

16.     Disputed in part.  Plaintiff does not dispute that Crouch testified that Rojas told Crouch that Plaintiff was in a relationship with Phil Hoeltzel, nor does Plaintiff dispute that she was not present for this conversation; however Crouch did *not* testify that that is the *only* thing Rojas told her about Plaintiff.  Instead, Crouch testified that Rojas told her Plaintiff was driving

Hoeltzel's car because Hoeltzel had spent the night with Plaintiff at her house and suggested that Plaintiff and Hoeltzel were in a relationship.  **Deposition of Lorie Crouch ("Crouch Depo"), attached hereto as Ex. 4, 27:10-29:7.**

17.     Undisputed.

18.     Undisputed.

19.     Disputed.  Plaintiff reported to her then supervisor, Cheryl Hatton, that she was uncomfortable with the situation with another driver; Plaintiff did not specify Rojas by name, but she did have a short conversation with Hatton about the situation with Rojas.  **Plaintiff Depo, Ex. 1, 69:10-70:8.**

20.     Disputed in part.  As explained in the previous paragraph, Plaintiff does not dispute that she mentioned to Hatton in 2006 that she was uncomfortable with a co-worker, and that she did not identify Rojas by name.  Plaintiff also does not dispute that Hatton told Plaintiff she could talk to her about it, and that Plaintiff did not ever go back and talk to Hatton about it a second time; however, plaintiff *did* have a conversation with Hatton, *at that time*, about the situation with Rojas.  **Plaintiff Depo, Ex. 1, 69:10-70:8.**

21.     Undisputed.  More specifically, Plaintiff and her then husband separated at the very end of August or beginning of September, 2006.  **Plaintiff Depo, Ex. 1, 49:6-14.**

22.     Undisputed.

23.     Disputed in part.  Plaintiff does not dispute that the first time she complained to a UPS supervisor or manager about Rojas, *by name*, was in early 2007 when she complained to Wolford; however, as explained in paragraphs 19 and 20 above, Plaintiff complained to her supervisor about Rojas, without identifying him by name, in 2006.  **Plaintiff Depo, Ex. 1, 69:10-70:8;** *see supra*, **¶¶ 19-20.**  Plaintiff disputes that she "told Wolford not to report it to Human

Resources," because she did not know what to do about the problem and went along with Wolford's suggestions.  **Plaintiff Affidavit, Ex. 3, ¶ 3.**  Plaintiff also disputes defendant's contention that Plaintiff "did not characterize Rojas['] behavior as sexual harassment" at the time, because defendant cites nothing in the record which supports this contention.  ***See, e.g.,*** **Deposition of Keith Wolford ("Wolford Depo") attached hereto as Ex. 5, 16:22-18:9; Plaintiff Depo, Ex. 1, 77:4-79:7; Deposition of Josh Rikli ("Rikli Depo") attached hereto as Ex. 6, 38:1-9.**  Plaintiff does not dispute that Wolford told Plaintiff that he would not have Rojas and Plaintiff meet on area anymore.  **Pretrial Order (Doc.60), 4.a(3) (stipulated fact).**

24.     Disputed in part.  As explained in the previous paragraph, Plaintiff disputes defendant's contention that the March 14, 2007, meeting with Wolford was the first time Plaintiff characterized Rojas' conduct as sexual harassment, because defendant cites nothing to support this contention; rather Wolford's testimony is that the March 14, 2007, meeting was the first time *that he perceived* Rojas' behavior as crossing the line into "harassment."  **Wolford Depo, Ex. 5, 21:23-23:2.**

25.     Undisputed.

26.     Undisputed.

27.     Undisputed.

28.     Undisputed.

29.     Undisputed.

30.     Undisputed.

31.     Undisputed.

32.     Disputed as incomplete.  Plaintiff does not dispute that UPS terminated Rojas on or about April 4, 2007, following its investigation of Plaintiff's complaint.  **Pretrial Order**

**(Doc.60), 4.a(8).** Plaintiff also does not dispute that the "Official Notice of Termination" letter issued to Rojas by Division Manager Jamie Diaz on April 5, 2007, states that Rojas' "employment with UPS is terminated effective April 4, 2007 pursuant to Article 17(i) Other serious offenses; of the Teamsters Central Region/UPS Supplemental Agreement." **Defendant's Exhibit 16.** However, the *reason* UPS terminated Rojas on April 4, 2007, was because it determined that he had sexually harassed Plaintiff, which counted as "other serious offenses." **Deposition of Jaime Diaz ("Diaz Depo"), attached hereto as Ex. 7, 35:9-35:15, 50:23-51:2, 112:1-112:5, 116:21-117:8, 120:22-121:2.**

33.  Undisputed.

34.  Undisputed.

35.  Disputed.  While Plaintiff does not dispute that UPS has entered into collective bargaining agreements with the Union, Plaintiff is not a party to any such agreements and is not a member of the Union; as such, Plaintiff has not "agree[d] to accept and be bound by the results of the grievance process." **Plaintiff Depo, Ex. 1, 13:19-14:13.**

36.  Undisputed.

37.  Undisputed.

38.  Undisputed.

39.  Disputed in part.  Plaintiff does not dispute that the April 9, 2007, local grievance hearing resulted in a deadlock, and that the issue was then taken to a Mo-Kan grievance panel. Plaintiff also does not dispute that UPS' position, *as stated at the April 9, 2007, local grievance hearing*, was that Rojas' termination was warranted.  However, UPS' *ultimate* position, expressed by the decision of the UPS managers on the Mo-Kan panel, was the opposite of this. *See infra,* ¶ 45.

40.     Undisputed.  Furthermore, in order to issue Rojas the second termination, UPS put Rojas back on the clock on April 9, 2007.  **Deposition of Mario Rojas ("Rojas Depo"), attached hereto as Ex. 8, 115:25-116:23, 208:9-209:10; Diaz Depo, Ex. 7, 112:12-113:17.**

41.     Undisputed.

42.     Disputed in part.  Plaintiff does not dispute that UPS refused, *at the April 16, 2007, local grievance hearing*, to put Rojas back to work and maintained*, at that hearing*, that his termination was warranted.  However, UPS' *ultimate* position, expressed by the decision of the UPS managers on the Mo-Kan panel, was the opposite of this.  ***See infra,* ¶ 45.**

43.     Disputed in part.  Plaintiff does not dispute that J.D. Graham attended the local hearings to represent her, and she does not dispute that she did not give him any information; however, Plaintiff disputes that she refused his assistance, because Graham never offered any assistance or asked for any information.  **Plaintiff Affidavit, Ex. 3, ¶ 5.**

44.     Undisputed.

45.     Disputed in part.  Plaintiff does not dispute that some of the UPS employees present at the Mo-Kan (a.k.a. "Two-State") hearing suggested that Rojas' termination be upheld, and that these suggestions included the presentation of several statements from Plaintiff's coworkers.  However, Plaintiff disputes defendant's contention that "UPS used its best efforts to advocate for Rojas' termination," because the UPS managers on the panel voted unanimously with the Union to reduce Rojas' two terminations to a one-day suspension, return him to work in the same center and on the same route as he had worked prior to being terminated, and pay him for all days missed except the one day for which he had already been paid when UPS issued him a second termination.  **Diaz Depo, Ex. 7, 34:5-35:1, 40:15-41:17, 50:2-50:22; Deposition of Harold McLaughlin ("McLaughlin Depo"), attached hereto as Ex. 9, 35:6-36:2, 37:25-**

**38:13;  Rojas  Depo,  Ex.  8,  13:15-14:6,  128:13-129:19,  130:15-131:5,  208:9-209:10; Deposition of J.D. Graham ("Graham Depo"), attached hereto as Ex. 10, 29:3-31:8.**  Thus, through the actions of the UPS managers on the Mo-Kan panel, UPS used its best efforts to completely adopt the Union's position and return Rojas to work with full back pay and without any plan or conditions to prevent Rojas from further sexually harassing or retaliating against Plaintiff or other UPS employees or customers.

46.    Disputed  as  incomplete.   Plaintiff does not dispute that the Mo-Kan panel's determination  included  a  statement  that  Rojas'  termination  was  being  reduced  to  a  one-day suspension; however, the determination also included UPS agreeing to return Rojas to work in the same center and on the same route as he had worked prior to being terminated, and pay him for all days missed except the one day for which he had already been paid when UPS issued him a second termination.  **Diaz Depo, Ex. 7, 34:5-35:1, 40:15-41:17, 50:2-50:22; McLaughlin Depo, Ex. 9, 35:6-36:2, 37:25-38:13; Rojas Depo, Ex. 8, 13:15-14:6, 128:13-129:19, 130:15-131:5, 208:9-209:10; Graham Depo, Ex. 10, 29:3-31:8.**

47.    Undisputed.

48.    Undisputed.

49.    Undisputed.

50.    Disputed in part.  Plaintiff does not dispute that the only way for a driver to obtain a permanent assignment to a particular delivery route "is by bidding on [that route when it is] open and available . . . and having the seniority to win that route," but this says nothing about the ways in which a driver can come off a route to which he or she is already assigned; for this reason, Plaintiff disputes whether this is "the only way for a driver to change from one bid delivery route to another."  Plaintiff does not dispute that she is physically capable of writing her

name on bid sheets and that, *if* such a sheet had been posted for an open route in another center, and *if* she had placed her name on such a sheet, and *if* she had had the seniority to win the route, "she could have changed Centers and avoided interacting with Rojas"; however, Plaintiff disputes whether she "could have bid on another route to move from the West Center to another Center" or that she "has not bid on any other routes," because she is not sure whether she bid on another route or not; she might have bid on a route and not gotten it.  **Plaintiff Depo, Ex. 1, 27:3-8.**

51.     Disputed in part.  Plaintiff does not dispute that "Wolford, at some point, allowed Plaintiff [to start her route] between 8:40 a.m. and 8:50 a.m., after she told him that she had a hard time getting her kids to school and then to work by 8:40 a.m."; however, Plaintiff disputes that she was allowed "to get to work late," because Wolford changed her start time from 8:40 a.m. to 8:50 a.m., and there is no indication that she ever missed the 8:50 a.m. start time Wolford had given her.  **Plaintiff Affidavit, Ex. 3, ¶ 2; Plaintiff Depo, Ex. 1, 24:9-18, 154:20-156:2; Wolford Depo, Ex. 5, 29:21-30:22, 32:7-34:1, 37:3-14.**  Plaintiff does not dispute that "[a]fter talking to Diaz about the start time, Mr. Wolford switched [Plaintiff's] time"; however, Plaintiff disputes defendant's stated reason for this change as mere pretext for retaliation, because Diaz gave the instruction to revoke the accommodation, which had been in place for approximately eight months, a mere eight weeks after Plaintiff complained about Rojas and only two weeks after Rojas was reinstated.  **Plaintiff Affidavit, Ex. 3, ¶ 2; Plaintiff Depo, Ex. 1, 154:20-156:2, 156:21-157:15; Wolford Depo, Ex. 5, 30:23-32:11, 34:2-36:17.**

52.     Disputed in part.  Plaintiff does not dispute that O'Millian, "after speaking with Plaintiff regarding her professed discomfort at seeing Rojas in the morning, offered to move her start time back thirty minutes" and that O'Millian, after speaking with Diaz, "told Plaintiff her

start time would not be moved"; however, Plaintiff disputes defendant's stated reason for this change as mere pretext for retaliation, because O'Millian told Plaintiff that he had changed the start time on the schedule, but Diaz denied the change without giving O'Millian any reason. **Plaintiff Depo, Ex. 1, 206:13-207:2.**

53.     Undisputed.

54.     Undisputed.

55.     Undisputed.

56.     Undisputed.

57.     Undisputed.

58.     Undisputed.

59.     Disputed in part.  Plaintiff does not dispute that decisions about route assignments are *supposed to be* determined, *in part*, "on projected delivery and pick-up requirements"; however, Plaintiff disputes defendant's implicit suggestions that these are the only factors used by dispatch supervisors in making decisions regarding route assignments.  In fact, dispatch supervisors do not always use these factors in making decision about route assignments, and they frequently use factors in addition to these.  **Deposition of Michael Bayers ("Bayers Depo"), attached hereto as Ex. 11, 17:10-25 (makes sure drivers are dispatched at least eight hours' worth of work); Declaration of Cheryl Hatton ("Hatton Declaration"), attached hereto as Ex. 12, ¶ 4 (instructed to dispatch Plaintiff's route in ways that made it impossible to run in a timely fashion); Deposition of Douglas O'Millian ("O'Millian Depo"), attached hereto as Ex. 13, 36:1-37:25 (dispatch supervisor tries to minimize overtime hours).**

60.     Disputed in part.  Plaintiff does not dispute that a driver becomes "unassigned" when his or her route is eliminated and that unassigned drivers are *supposed to be able to*

"choose from a list of available routes in order of seniority"; however, UPS supervisors do not always allow unassigned drivers to pick in order of seniority.  **Deposition of Nathan Williams ("Nathan Williams Depo"), attached hereto as Ex. 14, 77:24-79:21 (Rajeev Jain would hide routes from certain drivers, including Plaintiff, and not let them pick from the entire list, even if they had the seniority to do so).**

61.    Undisputed.

62.    Disputed as incomplete.  Plaintiff does not dispute that Nathan Williams testified as described, nor does Plaintiff dispute that she did not hear Rajeev Jain's comments to Nathan Williams.  Jain told Williams, on March 30, 2007, that he (Jain) had been told to watch Plaintiff and write her up for everything; also, Jain asked Williams to talk to Plaintiff for him, because he (Jain) was aware that she had made sexual harassment charges and did not want to get "further implicated."  **Nathan Williams Depo, Ex. 14, 48:13-52:11, 99:7-102:24.**

63.    Disputed in part.  Plaintiff does not dispute that "[o]ther UPS employees have had difficulty working with Jain"; however, Plaintiff disputes that Jain is an "all-purpose offender," because Plaintiff did not have problems with Jain being hostile towards her until after she complained about Rojas.  **Plaintiff Depo, Ex. 1, 194:15-195:14.**

64.    Disputed in part.  Plaintiff does not dispute that *some* "UPS employees are counseled, written up, or disciplined on a regular basis"; however, some drivers, including Plaintiff prior to her making complaints about sexual harassment and retaliation, are *not* counseled or disciplined on a regular basis.  **Wolford Depo, Ex. 5, 7:1-7:11 (no discipline problems with Lisa prior to her bringing complaints against Rojas); Hatton Declaration, ¶ 2 (Plaintiff "was a good and dependable driver"); Deposition of Mary Schremser**

**("Schremser Depo"), attached hereto as Ex. 15, 60:15-61:20 (does not get discipline very often; cannot remember last time she was written up).**

65.     Undisputed.

66.     Disputed.  Plaintiff has admitted that Rojas' harassment of her continued "through April of 2007"; she has *not* admitted that "Rojas has not harassed her since his termination [on April 4, 2007]."  **Pretrial Order (Doc.60), 5.a.1 (Plaintiff's Factual Contentions); Plaintiff Depo, Ex. 1, 229:18-230:3.**

67.     Disputed in part.  Plaintiff does not dispute that "[d]rivers' start times are based on the location of the delivery vehicles in the building"; however, Plaintiff disputes that truck location in the building is "determined by" the *single factor* of trying to have "vehicles delivering to the same geographical location grouped together."  The start times of the trucks in the center are staggered because the trucks in the front of the center have to move before the trucks behind them can get out.  **O'Millian Depo, Ex. 13, 22:15-23:10, 93:14-22; Bayers Depo, Ex. 11, 24:16-25:21.**  UPS does not always group trucks together in the building based on geographic delivery area.  **Bayers Depo, Ex. 11, 23:5-24:15.**  UPS determines the location of trucks in the center using several factors: "[t]ypically the [trucks] that are first out would be the ones that have to travel farthest to get to their area . . . then we also will attempt to group areas together that are close, and then . . . we're going to try to even out the number of packages that each preloader has to load in that aspect as well."  **O'Millian Depo, Ex. 13, 23:19-24:25;** *see also* **Bayers Depo, Ex. 11, 21:9-24:15.**  In addition, some routes must have a later start time than most routes because they have "late pickups" assigned to them, and some trucks need to leave earlier because they are delivering lots of next-day air packages; and so, for those trucks, their location in the building is actually determined by their early or late start time requirement.

**O'Millian Depo, Ex. 13, 23:3-10; Bayers Depo, Ex. 11, 24:16-26:9.**  Thus, there are a variety of interests and factors that are considered in UPS' normal process of determining start times and truck locations, rather than just one.

68.    Disputed in part.  Plaintiff does not dispute that "package cars are loaded in the early morning by preloaders off a conveyor belt" or that *one factor* normally used by UPS in determining truck placement in the building is to attempt to group together trucks which deliver to the same geographic area to minimize the impact of preloaders putting packages on the wrong truck; however, Plaintiff disputes Defendant's assertion that her package car "has been situated near Rojas' car because [of this single factor.]"  As explained in the previous paragraph 67, UPS considers several factors in determining truck location in the building.  *See supra*, ¶ 67.  With Plaintiff's package car specifically, which she does not take out of the building until the afternoon, the interest of grouping together trucks which deliver to the same geographic area to minimize the impact of preloaders putting packages on the wrong truck *is not the controlling factor*.  **Bayers Depo, Ex. 11, 43:7-44:3.**

69.    Undisputed.

70.    Disputed as incomplete.  Plaintiff does not dispute "that she returned to the building two hours late after getting stuck in the snow on December 27, 2008"; however, numerous times throughout the day, Plaintiff had called her On-Car Supervisor at the time, Doug O'Millian, to tell him that her truck kept getting stuck in the snow and that she needed help getting her route done in time.  **Plaintiff Depo, Ex. 1, 214:4-24.**  The next day, O'Millian issued Plaintiff a "final warning" for being two hours late, even though Plaintiff had never been given any prior warnings and had communicated with O'Millian throughout the day.  **Plaintiff Depo, Ex. 1, 214:25-216:5.**

71.     Undisputed.

72.     Undisputed.

73.     Disputed as incomplete.  Plaintiff does not dispute that she testified as stated with respect to Bill Margrave's comments to her; however, defendant has incompletely presented Plaintiff's conversation with Don Lewick.  Plaintiff asked Lewick if she could attend the Mo-Kan (a.k.a. "Two-State") hearing; in response, Lewick told Plaintiff that "he would just rather protect [her] than [have her] go through it" and that "he was trying to protect [her] by not going because they would tear [her] up and make [her] look like a whore and that with a lot of the union guys we bring it on ourselves, and he didn't want me to be put through it."  **Plaintiff Depo, Ex. 1, 134:12-135:16.**  Plaintiff does not dispute that, after Lewick said all of this to her, she did not insist on attending the Mo-Kan hearing.

74.     Undisputed.

75.     Disputed.  When Rhodes called Plaintiff into the meeting on September 28, 2007, he told Plaintiff that he wanted to talk to Plaintiff about her insurance problem and trying to fix it; and, once in the meeting, they did briefly discuss the problems with Plaintiff's insurance.  **Plaintiff Depo, Ex. 1, 180:2-13.**  Then, Liberti mentioned the EEOC meeting the day before and demanded that Plaintiff explain why she had made claims about retaliation; Plaintiff told Liberti that other drivers were calling her names, that her truck had been placed right next to Rojas' truck, and that she was having problems with her UPS-paid insurance coverage.  **Plaintiff Depo, Ex. 1, 180:14-21, 184:14-188:10; Deposition of Susan Richardson ("Richardson Depo"), attached hereto as Ex. 16, 18:24-19:17.**  Rhodes later told Plaintiff that he did not know what was going on with the EEOC, and he just thought the meeting was going to be about the problems she had been having with her health insurance. **Plaintiff Depo, Ex. 1, 189:16-190:8.**

76. Undisputed.

77. Disputed as incomplete. Plaintiff does not dispute that defense counsel asked her, "can you tell me anything more about why you thought [Liberti] was being hostile or intimidating or what it was he was saying that was making you feel that way?" **Plaintiff Depo, Ex. 1, 187:22-25.** Plaintiff also does not dispute that she responded, "[b]ecause I didn't want to be there, I didn't ask to be there." **Plaintiff Depo, Ex. 1, 188:1-2.** However, immediately before that, Plaintiff described several other reasons she thought Liberti was being hostile and intimidating; namely, Liberti telling her that "I don't care about your stupid lawyer," as well as his raised voice and obvious frustration with her, which led her to cry and ask to leave. **Plaintiff Depo, Ex. 1, 184:20-185:15; 187:3-188:10.** Rather than allowing Plaintiff to leave, Liberti told her that "we're almost done here." **Plaintiff Depo, Ex. 1, 188:3-10.** Plaintiff also described the intimidating environment in which the meeting was held: when Plaintiff and Rhodes entered the office, Rhodes closed the door and blocked it with his chair; when two union stewards and another driver arrived to represent Plaintiff, Rhodes briefly opened the door to talk to them, but refused them entry; when the union stewards knocked again, Rhodes ignored them and did not open the door. **Plaintiff Depo, Ex. 1, 189:1-15.** In the brief time that the door was open, the co-workers who had come to help Plaintiff noticed that the windows of the office had been covered and that Plaintiff was crying; it also seemed like the managers were trying to break Plaintiff down. **Nathan Williams Depo, Ex. 14, 66:20-69:9; Deposition of Maurice Poindexter ("Poindexter Depo"), attached hereto as Ex. 17, 39:18-41:7, 81:10-83:16.** The hostile and intimidating atmosphere in the meeting is further confirmed by Rhodes' later apology to Plaintiff for her being "ambushed" in the meeting. **Plaintiff Depo, Ex. 1, 189:16-190:8.**

78. Undisputed.

79.     Undisputed.

80.     Disputed.  Jain told Nathan Williams on March 30, 2007, that he (Jain) had been made aware of Plaintiff's harassment charges against Rojas and her situation with the company, that he had been told to watch every step Plaintiff took and write her up for everything, and that he did not want to be implicated any more than he already was.  **Nathan Williams Depo, Ex. 14, 48:13-52:11, 99:7-102:24.**

81.     Disputed.  Plaintiff testified that she believed, *at that particular moment*, that Diaz followed her on October 8, 2007, because he was retaliating against her for having an injury; however, she does not really know why Diaz followed her that day, and did not deny that it could have been because she had complained of harassment.  **Plaintiff Depo, Ex. 1, 197:22-198:7.**

82.     Undisputed.

83.     Disputed in part.  Plaintiff does not dispute that Diaz "told Plaintiff to stay off her cell phone"; however, Diaz did not call any driver to set up a meeting, because Plaintiff had already done that.  **Plaintiff Depo, Ex. 1, 200:5-202:7; Plaintiff Affidavit, Ex. 3, ¶ 7.**

84.     Disputed in part.  Plaintiff does not dispute that she was wearing a splint on her hand or that she was calling driver Joe Monslow to arrange a meeting spot to give him his misroutes when Diaz saw Plaintiff driving on October 8, 2007; however, Plaintiff disputes that she was "talking on her cell phone and smoking a cigarette," that she was "committing unsafe acts," and that Diaz "discussed [any] safety concerns with her."  Diaz did tell Plaintiff that he could take her out of service for being on her cell phone.  **Plaintiff Depo, Ex. 1, 200:5-202:7; Plaintiff Affidavit, Ex. 3, ¶ 7.**

85.     Undisputed.

**B.     PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ("AMF")**

1.     "Package car drivers" are the UPS employees who drive the brown UPS delivery vans to deliver packages; they are also known as "drivers" and "service providers." **Rojas Depo, Ex. 8, 5:11-19; Deposition of Dan Krull ("Krull Depo"), attached hereto as Ex. 18, 4:8-5:5.**

2.     Plaintiff has worked in the West Center at the James Street facility since she became a full-time driver. **Pretrial Order (Doc.60), 4.a(2) (stipulated fact).**

3.     UPS' "James Street Facility" in Kansas City, Kansas, is divided into four "centers" labeled North, South, East, and West, each delivering packages to a different part of the Kansas City metropolitan area; the West Center serves Kansas City, Kansas, as well as Basehor, Bonner, and Leavenworth. **Plaintiff Depo, Ex. 1, 21:14-22:13.**

4.     Plaintiff is not a member of the Union, and does not pay any union dues, but she donates money to the union out of her paycheck. **Plaintiff Depo, Ex. 1, 13:19-14:13.**

5.     Each "center" divides its assigned service area into several "loops," which are geographic delivery areas; each "loop" is divided into several "routes," typically three to five routes, each of which is run by a UPS Package Car Driver. **Bayers Depo, Ex. 11, 7:20-9:16.**

6.     When permanent routes become available, drivers can "bid" on them, and the driver with the highest seniority who bids gets the route. **Plaintiff Depo, Ex. 1, 27:9-28:3.**

7.     When Plaintiff first became a full-time Package Car Driver, she first worked as an "unassigned cover driver" in the West Center, meaning she did not have a specific assigned route; then, in April of 2006, plaintiff was placed on route 92D permanently, and then successfully "bid" that route shortly thereafter. **Plaintiff Depo, Ex. 1, 22:14-23:11, 23:25-**

**24:18, 26:3-27:2;** *see also* **Krull Depo, Ex. 18, Ex. 18, 7:5-8:13 (explanation of "unassigned cover driver").**

8.      Each of the four centers is led by a "Business Manager" (commonly referred to as a "Center Manager"), who manages the Dispatch Supervisor and typically three "On-Road Supervisors" (commonly referred to as "On-Car Supervisors"), who in turn supervise the Package Car Drivers.  **O'Millian Depo, Ex. 13, 23:13-18; Jain Depo, Ex. 19, Ex. 19,, 4:20-6:3.**

9.      Overseeing all four centers in the James Street Facility, as well as the preload operations, is a "Division Manager"; the four Center Managers report directly to the Division Manager.  **Diaz Depo, Ex. 7, 5:17-6:19; Wolford Depo, Ex. 5, 32:10-11.**

10.      Before Plaintiff complained to UPS that she was being sexually harassed by a coworker, her supervisor and manager regarded her as an average to above-average driver who did not have any disciplinary problems.  **Wolford Depo, Ex. 5, 7:1-7:11; Hatton Declaration, Ex. 12, ¶ 2.**

11.      After Plaintiff complained to UPS that she was being sexually harassed by a coworker, through at least January of 2008, she was still perceived as a good driver by her supervisor and did not have any customer complaints.  **O'Millian Depo, Ex. 13, 67:9-68:1.**

UPS EMPLOYEES INVOLVED

12.      Jamie Diaz was the Division Manager overseeing package and preload operations at the James Street Facility from the beginning of 2007 through the beginning of 2009.  **Plaintiff Depo, Ex. 1, 163:9-17 (Diaz replaced Gary Allen as Division Manager), 301:11-18 (Gary Allen left at the end of 2006); Diaz Depo, Ex. 7, 4:17-23 (was Division Manager at time of his deposition in March 2009), 112:12-113:11 (was Division Manager at time of Rojas' terminations in April 2007).**

13.     Maurice Poindexter has witnessed Jamie Diaz yelling and swearing at female supervisors Cheryl Hatton and Sue Richardson in a way that he never did with male supervisors. **Poindexter Depo, Ex. 17, 62:12-63:19.**

14.     Keith Wolford was the West Center Manager from the beginning of 2006 through June 2007. **Wolford Depo, Ex. 5, 4:19-5:6, 56:15-57:3; Rikli Depo, Ex. 6, 18:4-19:6 (Wolford was West Center Manager when Plaintiff started as a Package Car Driver in January 2006).**

15.     Rudy Rhodes was in UPS' Human Resources department for several years; then Rhodes was the West Center Manager from June 2007 through at least September 2007. **Rikli Depo, Ex. 6, 18:4-19:6 (Rhodes followed Wolford as West Center Manager); UF 74 (Rhodes was West Center Manager on September 28, 2007).**

16.     Doug O'Millian was a West Center Dispatch Supervisor starting in September 2005. **O'Millian Depo, Ex. 13, 13:21-14:8.** In mid-2007, O'Millian changed positions to be Plaintiff's On-Car Supervisor. *See* **Plaintiff Depo, Ex. 1, 67:20-23 (O'Millian was Dispatch Supervisor until June of 2007), 193:3-12 & 195:22-196:5 (O'Millian was Plaintiff's On-Car Supervisor in October 2007); Hatton Declaration, Ex. 12, ¶ 4 (Hatton switched from On-Car Supervisor to Dispatch Supervisor in mid-2007).** O'Millian continued to be Plaintiff's On-Car Supervisor through January 2008. **O'Millian Depo, Ex. 13, 20:15-21:3.**

17.     Cheryl Hatton was Plaintiff's On-Car Supervisor from May 2006 through mid-2007. **Plaintiff Depo, Ex. 1, 67:5-17.** Hatton changed positions briefly in mid-2007 to be the West Center Dispatch Supervisor. **Hatton Declaration, Ex. 12, ¶ 4;** *see* **Bayers Depo, Ex. 11, 6:16-7:13 (Bayers became West Center's Dispatch Supervisor June 23, 2007).** Then Hatton went back to being a West Center On-Car Supervisor through the beginning of 2008. *See*

Richardson Depo, Ex. 16, 46:17-22 (Hatton was a West Center On-Car Supervisor when Richardson became one in January 2008).

18.     Mike Bayers was the West Center Dispatch Supervisor from June 2007 through the beginning of 2009. **Bayers Depo, Ex. 11, 6:16-7:13.**

19.     Rajeev Jain was a West Center On-Car Supervisor from approximately 2005 through the beginning of 2009. Deposition of Rajeev Jain ("Jain Depo"), attached hereto as Ex. 19 **3:11-4:19.**  In addition to his regular On-Car Supervisor duties, Jain was responsible for handling the West Center's daily staffing needs, including keeping track of drivers' days off and making the "pick sheet" for assigning routes to cover drivers. **Jain Depo, Ex. 19, Ex. 19, 18:21-20:11, 33:11-34:22; Krull Depo, Ex. 18, Ex. 18, 34:23-36:19.**  Jain was the West Center's "anchor": he had been in the West Center longer than all the other On-Car Supervisors and effectively ran the West Center regardless of who was in charge. **Krull Depo, Ex. 18, Ex. 18, 25:17-26:3, 70:11-73:19.**

20.     Sue Richardson was in UPS' Human Resources department starting in 1990, first as a Safety Clerk, then as an Employee Services Supervisor through January 2008; then Richardson was Plaintiff's On-Car Supervisor from January 2008 through the beginning of 2009. **Richardson Depo, Ex. 16, 4:25-5:24, 8:19-9:3.**

21.     Gary Liberti is the Kansas District Human Resources Manager.  **Defendant's Initial Disclosures ("Defendant's Initial Disclosures"), attached hereto as Ex. 20 p.6; Diaz Depo, Ex. 7, 7:21-8:1.**

22.     Larry Baldwin is the Kansa s District Comprehensive Health and Safety Manager, and previously was a Kansas District Employee Relations Manager.  **Defendant's Initial**

**Disclosures, Ex. 20, p.1; Wolford Depo, Ex. 5, 24:13-25:9;   Deposition of Brad Williams ("Brad Williams Depo"), attached hereto as Ex. 21, 14:8-14:15.**

23.     Brad Williams is the Kansas District Employee Relations Manager.  **Defendant's Initial Disclosures, Ex. 20, p.10; Diaz Depo, Ex. 7, 7:14-20.**

24.     Craig Knabel is the Kansas District Security Manager.  **Defendant's Initial Disclosures, Ex. 20, p.5; Wolford Depo, Ex. 5, 43:11-18.**

25.     Joe Oberle is the Security Supervisor for the James Street Facility.  **Defendant's Initial Disclosures, Ex. 20, p.8; Brad Williams Depo, Ex. 21, 13:3-5.**

26.     Joe Monslow is a West Center Package Car Driver and the main Union Steward for the West Center.  **Defendant's Initial Disclosures, Ex. 20, p.7; Poindexter Depo, Ex. 17, 50:2-14, 59:16-19.**

27.     Maurice Poindexter retired from a 30 year career with UPS in December 2008; prior to that, Poindexter was the most senior West Center Package Car Driver and the alternate Union Steward for the West Center. **Poindexter Depo, Ex. 17, 6:12-7:17.**

28.     Nathan Williams has worked for UPS for 25 years and currently works as a Feeder Driver for UPS; prior to May 2008, he was a Package Car Driver in the West Center. **Nathan Williams Depo, Ex. 14, 5:20-6:9,**

29.     Josh Rikli has been a UPS Package Car Driver for nine years, and he has worked in the West Center of the James Street facility for that whole time. **Rikli Depo, Ex. 6, 5:17-20, 9:17-25.**

30.     Dan Krull has worked at UPS for ten years, first as a supervisor, then as a Package Car Driver in the West Center for the past three years. **Krull Depo, Ex. 18, Ex. 18, 4:8-22, 6:11-15, 48:18-49:23.**

31.     Lorie Crouch has worked at UPS for 15 years as a Package Car Driver, the last six years in the West Center of the James Street facility.  **Crouch Depo, Ex. 4, 4:14-19, 7:19-9:8.**

32.     Ramon Conejo has worked at UPS for 14 years, the last nine years as a Package Car Driver in the West Center of the James Street facility.  **Conejo Depo, Ex. 2, 5:7-17, 8:9-9:8**

33.     Mary Schremser has worked at UPS for nine years as a Package Car Driver in the East Center of the James Street facility.  **Schremser Depo, Ex. 15, 5:21-6:5, 7:3-11.**

34.     Mario Rojas has worked at UPS for over 30 years, and has been a Package Car Driver for approximately 20 years, most recently in the West Center at the James Street Facility.  **Rojas Depo, Ex. 8, 4:22-5:10, 16:25-17:3.**

ROJAS' HISTORY OF INAPPROPRIATE SEXUAL COMMENTS AND CONDUCT

35.     Rojas has flirted with women on his route.  **Rikli Depo, Ex. 6, 54:11-55:3; Defendant's Ex. 14 (Investigation Detail Report), p.5 (notes of Rikli interview);** *see also* **Crouch Depo, Ex. 4, 45:2-46:17 (Mario talked with Crouch about flirting with his customers).**

36.     Nathan Williams, who had known Rojas for the entire 20 years he was a Package Car Driver, observed Rojas making sexual references about women to his co-workers, and that Rojas was "sort of a ladies' man, so when women came into the work area, he tried to get a date."  **Nate Williams Depo, 6:1-3, 16:13-17:15, 34:10-35:5.**

37.     Rojas has flirted with Lorie Crouch, a female UPS employee.  **Crouch Depo, Ex. 4, 46:18-47:10.**

38.     Rojas has asked out Cheryl Hatton, a female UPS employee, and made comments to her about her sexuality.  **Defendant's Ex. 14 (Investigation Detail Report), p.13 (notes of Hatton interview).**

39.     Rojas said to Mary Schremser, a female UPS employee, "What happened Friday night? You told me I could come over and sleep with you"; Rojas also whistled at Schremser almost daily for a period of about two months, and made a sexual gesture to her by putting his fingers to his mouth in a "V" shape and sticking his tongue through them. **Schremser Depo, Ex. 15, 11:11-13:20, 16:8-16:17, 18:18-19:11, 20:16-21:25; Defendant's Ex. 14 (Investigation Detail Report), p.7 (notes of Schremser interview).**

40.     Schremser complained to UPS about her problems with Rojas; in response, Rudy Rhodes, then in UPS' human resources department, told her he would investigate the matter.  It took Rhodes approximately two months to get back to Schremser; and, when he did, his response was that nothing could be done because it was a "he said, she said" scenario with no witnesses. **Schremser Depo, Ex. 15, 20:16-22:24; Defendant's Ex. 14 (Investigation Detail Report), p.7 (notes of Schremser interview).**

41.     Rojas has made sexual remarks about female customers and UPS employees to other UPS drivers and supervisors, such as "I could do her" or "I had her" or sexual comments about a woman's appearance.  **Krull Depo, Ex. 18, Ex. 18, 64:20-67:14; Defendant's Ex. 14 (Investigation Detail Report), p.13 (notes of Dave Knoll interview); Plaintiff Depo, Ex. 1, 40:19-42:21.**

42.     Plaintiff heard Rojas say to a customer, "Here kiddie, kiddie, come here so I can give you some candy"; then Rojas made a sexual gesture toward the female customer by putting his fingers to his mouth and sticking his tongue out.  **Plaintiff Depo, Ex. 1, 43:19-44:13.**

43.     Rojas would make comments about the physical attributes of female UPS employees to other UPS employees; for example, Rojas told several other UPS drivers that

"because [Plaintiff has] big boobs, she ought to be delivering in a tube top." **Conejo Depo, Ex. 2, 21:2-21:21, 22:4-22:16.**

44.     Rojas told Josh Rikli, another UPS driver, that he (Rikli) would have to take Plaintiff home because he was one of Plaintiff's boyfriends. **Rikli Depo, Ex. 6, 32:1-33:12.**

45.     Rojas told Lorie Crouch, another UPS driver, that Plaintiff was having a relationship with a supervisor, Phil Hoeltzel, and that Plaintiff had spent the night at the supervisor's house; Crouch later learned from Plaintiff that Rojas' accusation was untrue. **Crouch Depo, Ex. 4, 27:14-29:3;** *see also* **Rojas Depo, Ex. 8, 72:22-74:13 (confirming he had a conversation with Crouch about Plaintiff and Hoeltzel).**

MAY 2006: ROJAS BEGINS TO SEXUALLY HARASS PLAINTIFF

46.     Plaintiff first met Rojas when she became a West Center driver in the beginning of 2006; Plaintiff and Rojas have both worked in the West Center since that time. **Plaintiff Depo, Ex. 1, 37:9-38:2; Pretrial Order (Doc.60), 4.a(9) (stipulated fact).**

47.     Plaintiff began having problems with Rojas making unwanted sexual comments and conduct toward her in May or June of 2006. **Plaintiff Depo, Ex. 1, 44:23-45:3.**

48.     In May or June of 2006, Rojas asked Plaintiff, on more than one occasion "How are you going to get home? Is one of your boyfriends going to take you home?" **Plaintiff Depo, Ex. 1, 44:23-46:15 & 49:19-50:5.**

49.     Rojas asked Plaintiff if it was different being married to an African-American man because they "don't whistle in the wheat field" and they "like to toss salad"; Plaintiff later learned the meaning of these slang terms for sexual acts. **Plaintiff Depo, Ex. 1, 46:16-47:15 (***referencing* **Complaint (Doc.1), ¶ 11(a)).**

50.     In July of 2006, on one of Rojas' days off, Plaintiff encountered Rojas while delivering on her route; Rojas told Plaintiff that he had been watching her deliver packages across the street, and he asked her to lunch.  **Plaintiff Depo, Ex. 1, 51:6-52:24 (*referencing* Complaint (Doc.1), ¶ 11(c)).**

51.     Rojas periodically called Plaintiff, on days when she was working but he was not, to ask who was running his route and what was going on through the day; after awhile, Plaintiff stopped taking Rojas' phone calls on days when he was not working.  **Plaintiff Depo, Ex. 1, 62:12-63:24 (*referencing* Complaint (Doc.1), ¶ 11(h)).**

52.     Rojas told Plaintiff, in the presence of another coworker, that he had a dream about her delivering packages in a halter top and a short skirt.  **Plaintiff Depo, Ex. 1, 52:25-54:16 (*referencing* Complaint (Doc.1), ¶ 11(d)).**

53.     Rojas told Plaintiff that he had a dream where she went to his wife's battered women's shelter with her kids and that, in his dream, he was the only one there to save and help her; Rojas told Plaintiff that she was lucky that he was there at the shelter for her.  **Plaintiff Depo, Ex. 1, 54:21-55:19 (*referencing* Complaint (Doc.1), ¶ 11(g)).**

54.     Rojas told Plaintiff, on more than one occasion, that "being a girl is hard" and that she "shouldn't be a driver."  **Plaintiff Depo, Ex. 1, 57:22-58:9.**

55.     In March of 2007, Rojas cornered Plaintiff in the check-in room and said to her, in a rough voice, "What makes you think you don't have to speak to me?"  Plaintiff told Rojas to "leave me alone," and he responded, "You will speak to me when I speak to you."  **Rikli Depo, Ex. 6, 35:14-36:16; Plaintiff Depo, Ex. 1, 80:4-82:25.**

56.     On April 4, 2007, Rojas delivered a package containing nude photographs of Plaintiff to Plaintiff's then-husband, from whom Plaintiff was separated at the time.

**Defendant's Ex. 17 (statement of Corey Turrentine); Plaintiff Depo, Ex. 1, 116:1-117:19; UF 36.**

MARCH-APRIL 2007: UPS RESPONDS TO PLAINTIFF'S COMPLAINTS BY INVESTIGATING, TERMINATING, AND THEN REINSTATING ROJAS

57.     After investigating Plaintiff's March 14, 2007, complaints that Rojas was sexually harassing her, UPS determined that Rojas had indeed sexually harassed Plaintiff and terminated him for it on April 4, 2007.  **Diaz Depo, Ex. 7, 35:9-35:15, 50:23-51:2, 112:1-112:5, 116:21-117:8, 120:22-121:2; Defendant's Ex. 14 (Investigation Detail Report), p.14 ("Mario was terminated under article 171 for creating a hostile work environment, violating professional conduct, and sexual harassment by Division Manager Jamie Diaz").**

58.     UPS issued Rojas a second termination on April 9, 2007, because it had determined that he had retaliated against Plaintiff by placing nude photographs of her on her then-husband's car; because Rojas was already terminated at that time, UPS reinstated and paid him for the day so that it could issue the second termination.  **Rojas Depo, Ex. 8, 115:25-116:23, 208:9-209:10; Diaz Depo, Ex. 7, 112:12-113:17; UF 40.**

59.     On April 19, 2007, a "Two-State" panel comprised of equal numbers of union representatives and UPS managers heard Rojas' grievances on his two terminations; the UPS managers on the panel voted unanimously with the Union to reduce Rojas' two terminations to a one-day suspension, return him to work in the same center and on the same route as he had worked prior to being terminated, and pay him for all days missed except the one day for which he had already been paid when UPS issued him a second termination.  **Diaz Depo, Ex. 7, 34:5-35:1, 40:15-41:17; McLaughlin Depo, Ex. 9, 37:25-38:13; Rojas Depo, Ex. 8, 128:13-129:19, 130:15-131:5, 208:9-209:10; Graham Depo, Ex. 10, 29:3-31:8.**

60.     The decision of the "Two-State" panel required the agreement of the UPS managers on the panel.  **Diaz Depo, Ex. 7, 50:2-50:22; McLaughlin Depo, Ex. 9, 35:6-36:2; Rojas Depo, Ex. 8, 13:15-14:6.**

61.     UPS *could have* required Rojas to give up his route in the West Center as a condition of reinstatement if it the UPS managers on the Two-State panel had insisted on such a condition, because UPS has insisted on and obtained such conditions in previous Two-State decisions.  **Diaz Depo, Ex. 7, 118:7-119:5.**

MARCH-APRIL 2007: UPS BEGINS TO RETALIATE AGAINST PLAINTIFF

62.     During the course of UPS' investigation, Division Manager Jamie Diaz developed a belief that Plaintiff was having extramarital affairs and that she had encouraged Rojas' sexual behavior with her; because of this, Diaz believes, to this day, that Plaintiff is partially culpable for Rojas' sexual harassment of her.  **Diaz Depo, Ex. 7, 47:17-49:22.**

63.     On March 30, 2007, Rajeev Jain, a West Center On-Car Supervisor, told driver Nathan Williams that he (Jain) had been made aware of Plaintiff's harassment charges against Rojas and her situation with the company, that he been told to watch every step Plaintiff took and write her up for everything, and that he did not want to be implicated any more than he already was.  **Nathan Williams Depo, Ex. 14, 48:13-52:11, 99:7-102:24.**

64.     After Rojas was terminated and reinstated, West Center Manager Keith Wolford told Cheryl Hatton, then Plaintiff's On-Car Supervisor, to write Plaintiff up for every little thing and give her warning letters even if that was not the proper step in progressive discipline.  **Hatton Declaration, Ex. 12, ¶ 3.**

65.     Nathan Williams believed that UPS wanted Plaintiff fired after she complained about Rojas, because he observed Plaintiff being treated like a normal employee before her

complaints and treated with a lot of hostility from supervisors and dispatch personnel after she complained about Rojas.  **Nathan Williams Depo, Ex. 14, 57:10-58:2, 104:14-107:17.**

66.     Nathan Williams witnessed drivers friendly to Rojas shout things at Plaintiff like "just leave him alone" and "move" and "just quit" after Plaintiff complained to UPS about Rojas. **Nathan Williams Depo, Ex. 14, 58:23-59:18.**

67.     Nathan Williams spoke with Larry Baldwin—and later to Brad Williams—about there being tension in the workplace, a very hostile atmosphere, whenever Plaintiff and Rojas were in proximity, which created a negative atmosphere for the rest of their coworkers; they responded that all they could do to fix the situation would be to talk to Plaintiff.  **Nathan Williams Depo, Ex. 14, 26:9-27:12, 119:21-121:1.**

APRIL 2007: SUPERVISOR SENDS SEXUAL TEXT MESSAGE TO PLAINTIFF

68.     On April 27, 2007, a week after Rojas returned to work, Plaintiff received an inappropriate, sexual text message from a UPS supervisor, Phil Hoetzel, which said "How to satisfy a woman: caress, spoil, kiss, rub, tease, pamper, worship, respect and love. How to satisfy a man: swallow."  Plaintiff reported the incident to Division Manager Jamie Diaz.  **Plaintiff Depo, Ex. 1, 146:21-149:2 (*referencing* Complaint (Doc.1), ¶ 26); Diaz Depo, Ex. 7, 123:4-22.**

MAY 2007: UPS CHANGES PLAINTIFF'S START TIME

69.     In approximately September 2006, after Plaintiff separated from her then-husband, Corey Turrentine, and he moved out, Plaintiff had to take care of her children by herself.  Because of traffic in the morning, Plaintiff sometimes had trouble getting her children to school and then getting to work in time for her 8:40 a.m. start time.  When that happened, Plaintiff talked to Keith Wolford, then the West Center Manager, and he told Plaintiff that he would change her start time to 8:50 a.m., and that he would have someone move her truck

between 8:40 and 8:50 a.m. if necessary.  From that time until the beginning of May 2007, Plaintiff's 8:50 a.m. start time was never once an issue and there were never any complaints from anyone about the arrangement.  **Plaintiff Affidavit, Ex. 3, ¶ 2; Plaintiff Depo, Ex. 1, 24:9-18, 154:20-156:2; Wolford Depo, Ex. 5, 29:21-30:22, 32:7-34:1, 37:3-14.**

70.     On May 6, 2007, Wolford told Plaintiff that he could no longer honor their agreement that her start time would be 8:50 a.m., because a certain employee had complained about the arrangement.  Wolford did not identify the complaining employee to Plaintiff, but Plaintiff assumed it was Rojas, who had been back at work for approximately two weeks at that point.   In actuality, Division Manager Jamie Diaz was the employee who complained to Wolford; Diaz instructed Wolford to revoke the agreed-upon 8:50 a.m. start time and force Plaintiff to start at 8:40 a.m.  **Plaintiff Depo, Ex. 1, 154:20-156:2, 156:21-157:15; Wolford Depo, Ex. 5, 30:23-32:11, 34:2-36:17.**

APRIL-JUNE 2007: UPS INCREASES PLAINTIFF'S WORKLOAD

71.     After Rojas was reinstated, Cheryl Hatton, then Plaintiff's On-Car Supervisor, noticed that the dispatch started targeting Plaintiff's second vehicle, giving it lots of extra stops that it should not have had; Hatton also saw heavier than normal dispatch on drivers that witnessed Rojas' harassment of Plaintiff, including Nathan Williams, Josh Rikli, Maurice Poindexter, and Lorie Crouch.  **Hatton Declaration, Ex. 12, ¶ 3.**

72.     Nathan Williams perceived that Doug O'Millian, when he was West Center's Dispatch Supervisor, was dispatching Plaintiff's route in such a way as to make things worse for her, because she complained about Rojas.  **Nathan Williams Depo, Ex. 14, 38:22-39:13.**

73.     In the middle of 2007, Cheryl Hatton changed positions from On-Car Supervisor to Dispatch Supervisor for the West Center; when Hatton became the West Center's Dispatch Supervisor, Division Manager Jamie Diaz told her to hold Plaintiff accountable for every little

number mistake or dispatch mistake, even though Diaz was instructing Hatton to change Plaintiff's dispatch in ways that made it impossible for Plaintiff to run her route in a timely fashion.  **Hatton Declaration, Ex. 12, ¶ 4.**

74.     Maurice Poindexter witnessed West Center supervisors treating Plaintiff differently than other drivers after she complained about Rojas, including: over-dispatching Plaintiff's regular route, over-dispatching Plaintiff when she was supposed to have a shortened 8-hour day, denying her seniority rights in picking routes, and talking to her in a way more offensive than they would with other drivers.  **Poindexter Depo, Ex. 17, 60:5-62:11;** *see also* **Plaintiff Depo, Ex. 1, 64:15-65:1 (explanation of shortened eight-hour day).**

75.     Maurice Poindexter covered Plaintiff's route on more than one occasion, without giving any kind of advance notice to the Dispatch Supervisor that he was going to cover the route, and he found Plaintiff's route to be over-dispatched in a way that dispatch wouldn't do with other drivers.  **Poindexter Depo, Ex. 17, 73:12-76:1.**

76.     Nathan Williams made suggestions to Dispatch Supervisors Doug O'Millian and Mike Bayers on how to keep Rojas and Plaintiff separated on their routes to reduce the tension in the workplace, but neither dispatch supervisor acted on his suggestions.  **Nathan Williams Depo, Ex. 14, 41:6-43:7.**

JUNE 2007: DIVISION MANAGER INSTRUCTS PLAINTIFF TO "GET OVER IT"

77.     On June 21, 2007, Plaintiff met with Diaz regarding an on-the-job injury she had sustained; at the meeting, Plaintiff asked Diaz why Rojas was allowed to work in the same center as her after his reinstatement, and Diaz responded that Plaintiff needed to "get over it and move on."  **Plaintiff Depo, Ex. 1, 161:20-162:6, 163:23-164:15 (***referencing*** Complaint (Doc.1), ¶ 29).**

78.      After UPS received a copy of Plaintiff's July 2007 amendment to her Charge of Discrimination, which included a reference to Diaz telling Plaintiff to "get over it," Diaz was asked by someone in UPS' human resources department to explain the comment; he told HR that he did not say "get over it" but instead told Plaintiff to "put it behind [her] . . . and move on." **Diaz Depo, Ex. 7, 27:16-27:23, 29:21-30:9.**

79.      Diaz later told HR Director Gary Liberti, in an October 2007 email, "I did not tell [Plaintiff] to 'get over it' but I did tell her that I was concerned about how she took our conversations out of context and that excerpts seemed to be winding up on complaints filed by her with government agencies. Since that time, all my conversations with Lisa have been held with a third party witness present."  Diaz clarified in his deposition that his comment to Plaintiff was referring to her EEOC complaints; and that, after she allegedly misquoted him in one of those complaints, it became his policy to either have a witness present or take notes for all conversations he had with Plaintiff.  **Diaz Depo, Ex. 7, 21:12-21:24, 129:16-130:7, 133:13-135:1 (*referencing* Diaz Deposition Exhibit 116 (email from Diaz to Liberti), attached hereto as Ex. 7a).**

JULY 2007: UPS PLACES PLAINTIFF'S PACKAGE CAR RIGHT NEXT TO ROJAS' PACKAGE CAR

80.      At the beginning of July 2007, for the first time since Plaintiff had started running route 92D in April 2006, UPS moved Plaintiff's package car from the front of the center to a spot between the package cars of Mario Rojas and Lorie Crouch.  **Plaintiff Depo, Ex. 1, 26:3-27:2; Plaintiff Affidavit, Ex. 3, ¶ 6.**

81.      In July 2007, after Plaintiff's package car had been moved to a spot immediately adjacent to Rojas' package car, Plaintiff complained to her supervisor and manager about the

placement, but they gave her no explanation and did not change the placement until late in 2007. **Plaintiff Affidavit, Ex. 3, ¶ 6.**

82.     Near the end of July 2007, Plaintiff also complained about her package car being placed right next to Rojas' package car to Division Manager Jamie Diaz.  Rather than attempting to find a way to keep Rojas' and Plaintiff' package cars separated in the center, Diaz told Plaintiff that the placement would not change.  **Plaintiff Affidavit, Ex. 3, ¶ 6;** *see also* **Plaintiff Depo, Ex. 1, 180:1-180:21, 191:18-192:20 (in a September 2007 meeting, Plaintiff told Liberti about her complaint to Diaz); Diaz Depo, Ex. 7, 52:16-53:7 (confirming that UPS moved Plaintiff's truck next to Rojas' truck).**

SEPTEMBER 2007: UPS MANAGEMENT "AMBUSHES" PLAINTIFF IN A MEETING
REGARDING HER CHARGES OF RETALIATION

83.     On September 28, 2007, Rudy Rhodes, then Plaintiff's Center Manager, called Plaintiff into an office with several people from UPS' HR department "to work on [her] insurance."  **Plaintiff Depo, Ex. 1, 180:2-10, 184:14-23.**

84.     On her way into the meeting, Plaintiff asked the alternate union steward, Maurice Poindexter, to find the main union steward, Joe Monslow, and come be present for the meeting; the union stewards did not get to the office before the door was closed and the meeting started. **Plaintiff Depo, Ex. 1, 188:11-189:5.**

85.     When Plaintiff and Rhodes entered the office, Rhodes closed the door and blocked it with his chair; when the union stewards knocked on the door, Rhodes briefly opened the door to talk to them, but refused them entry; when the union stewards knocked a second time, Rhodes ignored them and did not open the door.  **Plaintiff Depo, Ex. 1, 189:1-15.**

86.     In the office for the meeting were Gary Liberti, Larry Baldwin, Sue Richardson (*before* she was an On-Car Supervisor), Rudy Rhodes, and Plaintiff.  **Plaintiff Depo, Ex. 1, 184:14-19; Richardson Depo, Ex. 16, 18:6-23.**

87.     The day before, on September 27, 2007, Plaintiff and representatives for UPS participated in an EEOC meeting related to her charges of discrimination.  **Plaintiff Depo, Ex. 1, 180:22-181:16.**

88.     In the meeting, Liberti mentioned the EEOC meeting the day before and asked Plaintiff to explain why she had made claims about retaliation; Plaintiff told Liberti that other drivers were calling her names, that her truck had been placed right next to Rojas' truck, and that she was having problems with her UPS-paid insurance coverage.  **Plaintiff Depo, Ex. 1, 180:11-21, 184:14-188:10; Richardson Depo, Ex. 16, 18:24-19:17.**

89.     At one point, Liberti asked Plaintiff to explain things her lawyer had said at the EEOC meeting, outside of her presence; plaintiff told him that she did not know and he would have to ask her lawyer, and Liberti responded, "I don't care about your stupid lawyer.  I'm asking you."  **Plaintiff Depo, Ex. 1, 180:11-21, 184:14-188:10.**

90.     Plaintiff felt intimidated by Liberti's hostile attitude in the meeting, especially his raised voice and obvious frustration with her; she asked to leave, but Liberti responded only that "we're almost done here."  **Plaintiff Depo, Ex. 1, 180:11-21, 184:14-188:10.**

91.     During the meeting, union stewards Maurice Poindexter and Joe Monslow, along with driver Nate Williams, knocked on the office door and attempted to enter, because the situation warranted the presence of a union steward or other non-management witness, but they were turned away.  The windows of the office had been covered to prevent anyone from seeing in.  When the door was briefly opened, they observed Plaintiff crying, and it seemed like the

managers were trying to break Plaintiff down.  After the meeting, Plaintiff was visibly upset. **Nathan Williams Depo, Ex. 14, 66:20-69:9; Poindexter Depo, Ex. 17, 39:18-41:7, 81:10-83:16.**

92.     Later in the day, Rhodes approached Plaintiff to ask if she was ok and apologize for her being "ambushed" in the meeting; Rhodes told Plaintiff that he did not know what was going on with the EEOC, and he just thought the meeting was going to be about the problems she had been having with her health insurance. **Plaintiff Depo, Ex. 1, 189:16-190:8.**

OCTOBER 2007: DIAZ CONTINUES TO RETALIATE AGAINST PLAINTIFF

93.     On October 8, 2007, Plaintiff was not running her regular route, because of an injury, but was shuttling packages out to another driver's route.  While parked at a gas station, calling the driver she was supposed to meet, Jamie Diaz came up to the truck, slammed the door open, and yelled at Plaintiff for being on her cell phone. **Plaintiff Depo, Ex. 1, 200:5-202:7.**

94.     On October 9, 2007, Plaintiff explained her history of problems with Rojas to Doug O'Millian, then Plaintiff's On-Car Supervisor.  O'Millian asked Plaintiff if it would help the situation if he changed Plaintiff's start time to approximately thirty minutes after Rojas' start time, and Plaintiff said that it would help a lot.  O'Millian told Plaintiff that he did change her start time on the schedule, but that Jamie Diaz had come to him about a week later and told him that he could not change Plaintiff's start time. **Plaintiff Depo, Ex. 1, 205:5-208:13 (*referencing* Complaint (Doc.1), ¶¶ 34-35).**

EARLY 2008: RAJEEV JAIN INSTRUCTS PLAINTIFF NOT TO TALK TO HIM

95.     Sometime after Sue Richardson became an On-Car Supervisor in January 2008, Rajeev Jain told Josh Rikli and Maurice Poindexter that he didn't want to get involved in the situation with Plaintiff, so he didn't want to talk to her.  Jain asked Rikli and Poindexter to tell

Plaintiff to talk to her supervisor, Sue Richardson, first, and only talk to him if she had gotten Richardson's permission first and it was a last resort.   Jain told them that he was taking Plaintiff's phone number out of his phone and, from that point on, he would not take her calls.

**Rikli Depo, Ex. 6, 78:7-80:16; Poindexter Depo, Ex. 17, 22:11-23:7, 44:15-46:5, 69:6-70:3.**

<u>FEBRUARY 2008: DIAZ THREATENS PLAINTIFF'S JOB BECAUSE OF THE TROUBLE SHE IS CAUSING OUTSIDE UPS</u>

96.     On January 23, 2008, Plaintiff filed a second Charge of Discrimination with the EEOC and filed with this Court the Complaint that initiated this lawsuit.   **Pretrial Order (Doc.60), 4.a(14) (stipulated fact); Defendant's Ex. 27 (January 23, 2008, Charge of Discrimination); Complaint (Doc.1).**

97.     On February 1, 2008, UPS was served with Plaintiff's Complaint.   **Return of Service (Doc.4).**

98.     On February 7, 2008, Jamie Diaz met with Plaintiff and told her: "due to the trouble you are causing outside, you are skating on thin ice" and "you are playing games"; on February 13, 2008, Plaintiff filed a grievance complaining about Diaz' comments.   **Plaintiff Depo, Ex. 1, 246:7-247:5.**

99.     Dispatch supervisor Mike Bayers, covering for Center Manager Rudy Rhodes, received Plaintiff's grievance on behalf of UPS on February 13, 2008, and immediately took it to Diaz, who then got involved in the situation.   **Bayers Depo, Ex. 11, 51:22-53:10.**

100.    On February 13, 2008, after Diaz read Plaintiff's grievance complaining about Diaz' retaliatory comments, Diaz threatened to terminate Plaintiff's employment; then, Plaintiff was taken into the office by Bayers and issued three write-ups with warning letters to follow, on issues for which Plaintiff had not been disciplined previously.   **Plaintiff Depo, Ex. 1, 248:19-**

**249:9, 250:24-251:15, 306:17-306:25; Bayers Depo, Ex. 11, 54:16-55:14 (confirming that he issued Plaintiff three write-ups that day).**

SPRING 2008: DIAZ ATTEMPTS TO DENY PLAINTIFF AN APPROVED DAY OFF

101.    In the first half of 2008 (prior to June), District Manager Jamie Diaz called Plaintiff's On-Car Supervisor at the time, Sue Richardson, the evening before Plaintiff had an approved personal day off and told Richardson to instruct Plaintiff to come in the next day. **Richardson Depo, Ex. 16, 82:9-83:1.**

102.    Richardson later told Plaintiff that Diaz had instructed her to "call [Plaintiff] at home, tell her we made a mistake, that she cannot have the day off.  If she does take the day, you're to fire her immediately."  **Plaintiff Depo, Ex. 1, 243:2-244:7;** *see also* **Richardson Depo, Ex. 16, 84:14-16 (confirms talking to Plaintiff about the incident).**

103.    Diaz is not ordinarily involved in choosing which drivers are asked to come back to work when there is a driver shortage, because it is the supervisors who take care of staffing and days off.  **Diaz Depo, Ex. 7, 155:9-16.**

104.    Richardson was upset by Diaz' instruction and did not think it was the right thing to do because Plaintiff had approved the personal day off through the Center Manager at the time, Rudy Rhodes; so, instead of following Diaz' instructions, Richardson called Brad Williams, Employee Relations Manager for UPS, who agreed with Richardson and told her not to call Plaintiff.  **Richardson Depo, Ex. 16, 83:2-84:11; Brad Williams Depo, Ex. 21, 25:10-27:17.**

105.    Diaz testified that he "might have been" upset with Richardson for going behind his back and contacting human resources.  **Diaz Depo, Ex. 7, 154:12-23.**

II.    **ARGUMENT**

A.    **SUMMARY JUDGMENT STANDARD**

Although Defendant accurately describes the standards for summary judgment, it consistently ignores one aspect of this standard throughout its Memorandum: the record must be viewed "in a light most favorable to the non-moving party."  **United Parcel Service, Inc.'s Memorandum of Law In Support of Its Motion for Summary Judgment (Doc.62), hereinafter "Defendant's Memorandum," p.18** (citing *Deepwater Invs., Ltd. V. Jackson Hole Ski Corp.*, 938 F.2d 1110 (10th Cir. 1991)).  This is an integral part of the summary judgment standard that must not be ignored; indeed, the Supreme Court has instructed that:

> the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-151 (2000) (internal citations and quotation marks omitted).  Ignoring this standard, Defendant has drawn inferences against the Plaintiff, ignored evidence that is favorable to Plaintiff, and relied on contradicted evidence from interested witnesses, especially on questions of intent.

Viewing the record in the light most favorable to the non-movinig party is particularly important when it comes to questions about the motives and intentions of Defendant's managers and supervisors.  Because "employment discrimination cases often turn on the employer's intent," summary judgment should seldom be granted in such cases.[1]  *Wirtz v. Kansas Farm*

---

[1] Courts in this district have not hesitated, even in what they have regarded as "close cases," to deny summary judgment and to allow the plaintiff his or her "day in court" when genuine issues of material fact are found

*Bureau Services, Inc.*, 274 F. Supp. 2d 1198, 1202 (D. Kan. 2003); *see also* **Randle v. City of Aurora**, 69 F.3d 441, 453 (10th Cir. 1995) ("Judgments about intent are best left for trial and are within the province of the jury."); **Romero v. Union Pac. R.R.**, 615 F.2d 1303, 1309 (10th Cir. 1980) (questions of motive and intent are "particularly inappropriate for summary judgment disposition").   At numerous points throughout Defendant's Memorandum, Defendant draws inferences about its managers' and supervisors' intentions, often based on the contradicted and biased testimony of interested witnesses.  The *jury* is free to draw inferences which are favorable to Defendant; but on summary judgment, the *Court* is prohibited from doing so.  Here, the record contains evidence from which a reasonable jury can infer discriminatory and retaliatory intent; and, on a motion for summary judgment, such inferences *must* be resolved in Plaintiff's favor.

### B.      SEXUAL HARASSMENT / DISCRIMINATION

With respect to Plaintiff's sexual harassment claim, Defendant attempts to create doubt as to Plaintiff's ability to show "(1) that the alleged harassment was based on sex, (2) that the alleged harassment was sufficiently severe or pervasive to create an abusive working environment, and (3) that there is any basis for imputing liability to UPS."  **Defendant's**

---

to exist.  *See, e.g.,* Kennedy v. General Motors Corporation, 226 F. Supp.2d. 1257 (D. Kan. 2002) (genuine issue of material fact on "pretext" precluded summary judgment); Bennett v. Emerson Elec. Co., 160 F. Supp. 2d 1244 (D. Kan. 2001) (same);  Lierz v. Coca Cola Enterprises, Inc., 36 F. Supp. 2d 1295 (D. Kan. 1999) (denying summary judgment in a retaliatory discharge case); McClurg v. GTECH Corp, 61 F. Supp. 2d 1150 (D. Kan. 1999) (denying summary judgment on plaintiff's claim of retaliation);  Flenker v. Willamette Industries, Inc., 68 F. Supp. 2d 1261 (D. Kan. 1999) (denying a renewed summary judgment motion, after remand, on plaintiff's claim of retaliatory discharge); Horsewood v. Kids R Us, 27 F. Supp. 2d 1279 (D. Kan. 1998) (denying summary judgment on plaintiff's "regarded as" disability discrimination claim); Bowers v. Bethany Medical Center, 959 F. Supp. 1385, 1392 (D. Kan. 1997) (denying summary judgment on plaintiff's retaliatory discharge claim); Byle v. Anacomp, Inc., 854 F. Supp. 738 (D. Kan. 1994) (denying summary judgment on a retaliatory discharge claim).

Indeed, the Court of Appeals for the Tenth Circuit has *reversed* summary judgment in many employment cases in which the lower court was found to have been too hasty in concluding that no genuine issue or dispute of material fact existed.  *See* Thiessen v. General Electric Capital Corp., 267 F.3d 1095 (10th Cir. 2001); Butler v. City of Prairie Village, Kan, 172, F.3d 736 (10th Cir. 1999) (reversing summary judgment on plaintiff's ADA discrimination and retaliation claims); Aldrich v. Boeing Co., 146 F.3d 1265 (10th Cir. 1998) (reversing summary judgment on plaintiff's ADA claim); Marx v. Schnuck Markets, Inc., 76 F.3d 324 (10th Cir. 1995) (summary judgment reversed on claim of retaliatory discharge); Langley v. Adams County, 987 F.2d 1473, 1476 (10th Cir. 1993) (finding a genuine issue of material fact precluding summary judgment).

**Memorandum (Doc.62), p.18.**   Defendant's doubt-creating efforts notwithstanding, there is sufficient evidence in the record from which a reasonable jury can find for Plaintiff on all three of these elements.   Thus, genuine issues of material fact preclude summary judgment on Plaintiff's sexual harassment claim.

### 1.   Rojas' Harassment of Plaintiff Was Based on Sex

An inference that harassment is based on sex may arise from varied facts.   Where harassment involves "explicit or implicit proposals of sexual activity[,] it is reasonable to assume those proposals would not have been made to someone of the same sex."   *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).   "[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."   *Id.*   For example, harassment is based on sex if "the harasser is motivated by general hostility to the presence of women in the workplace."   *Id.*   Essentially, "plaintiff must show that she was the object of harassment because of her gender."   *Jones v. Wichita State University.*, 528 F.Supp.2d 1196, 1215 (D. Kan. 2007).

Because seemingly gender-neutral harassment may nevertheless be motivated by a general hostility based on sex, the analysis must include consideration of the *context* in which the harassment occurs:

> [T]he Court does not engage in a mechanical analysis which excludes consideration of gender-neutral conduct. The Court considers the environment as a whole, including gender-neutral conduct, to determine the context in which the alleged harassment occurred. Though all conduct is relevant to determine context, only conduct which occurred because of plaintiff's gender can be a basis for liability under Title VII. When plaintiff produces evidence of both gender-based and gender-neutral harassment and a jury could reasonably view all of the allegedly harassing conduct as the product of sex and gender hostility, the fact finder must determine what inference should be drawn.

*Jones*, 528 F.Supp.2d at 1215 (internal citations omitted).   In this case, there is evidence of both gender-based and seemingly gender-neutral harassment of Plaintiff by Rojas; however, the

*context* of the situation, including Rojas' history of treating women in the workplace differently than men, permits the jury to reasonably view *all* of Rojas' harassment of Plaintiff as the product of sex and gender hostility.

That Rojas has a history of treating female coworkers and employees differently than his male coworkers, in ways that reflect his general hostility to the presence of women in the workplace, is the context within which his conduct towards Plaintiff must be considered.  For example, a long-time co-worker of Rojas testified that Rojas would make sexual references about women to his co-workers, and that Rojas was "sort of a ladies' man, so when women came into the work area, he tried to get a date."  **AMF 36.**  The record also contains specific examples of these behaviors.  Rojas has flirted with and made implicit proposals of sexual activity with female customers and coworkers.  **AMF 35, 37, 38 & 39.**  Rojas once made a sexual gesture to Schremser by putting his fingers to his mouth in a "V" shape and sticking his tongue through them.  **AMF 39.**  Plaintiff herself saw Rojas make this gesture toward a female customer while saying, "Here kiddie, kiddie, come here so I can give you some candy."  **AMF 42.**  Several of Rojas' coworkers have heard him make sexual comments about female customers and about female coworkers.  **AMF 36, 38, 39, 41, 42, 43 & 45.**  Finally, Rojas has explicitly told Plaintiff, on more than one occasion, that "being a girl is hard" and that she "shouldn't be a driver."  **AMF 54.**  These examples, taken together, support a jury's inference that Rojas has a general hostility to the presence of women in the workplace, viewing his female coworkers and customers as little more than sexual objects.

With this context, Rojas' harassment of Plaintiff, some of which is gender-neutral and some of which is overtly gender-based, can all be viewed by the jury as being based on sex. Where Rojas tried to get dates with female coworkers in the past, Rojas tried to take Plaintiff to

lunch and called her on his days off.  **AMF 50 & 51.**  Just as Rojas made sexual comments to female customers and coworkers in the past, Rojas talked to Plaintiff about whether her husband engaged in certain sexual acts and told Plaintiff he dreamt about her delivering packages in a halter top and short skirt.  **AMF 49 & 52.**  Defendant admits that at least these last two incidents of harassment "can be said to have sexual connotation."  **Defendant's Memorandum (Doc.62), p.21.**

Ignoring or downplaying the context of the situation, Defendant attempts to pass off this harassment of Plaintiff by Rojas as the result of some gender-neutral, personal animosity. **Defendant's Memorandum (Doc.62), p.20-21.**  Defendant cites ***Jones v. Wichita State University*** for the proposition that "[p]ersonal animosity is not the equivalent of sex discrimination."  ***Id.*** at 21  (citing ***Jones***, 528 F.Supp.2d at 1215).  However, ***Jones*** makes clear that seemingly gender-neutral harassment should be considered in context, for it is possible that even gender-neutral harassment can be based on sex.  ***Jones***, 528 F.Supp.2d at 1215.  In this case, Rojas' history of treating male and female coworkers differently is evidence from which the jury can reasonably conclude that Rojas has a general hostility to the presence of women in the workplace; and, whatever personal animosity Rojas has towards Plaintiff is itself based on her sex and presence in the workplace.  At the very least, this is an issue about which reasonable minds may differ, which makes it an appropriate question for a jury and not something that should be decided on a motion for summary judgment.

## 2. Rojas' Harassment of Plaintiff Was Severe and Pervasive

The next element challenged by Defendant is whether Rojas' harassment of Plaintiff was "severe and pervasive."  There is no "'mathematically precise test' for determining when conduct is sufficiently severe or pervasive to trigger Title VII liability."  ***Carrasco v. The Boeing Co.***, No. Civ.A. 04-1166-MLB, 2005 WL 1319051, *6 (D. Kan. May 11, 2005) (citing ***Harris v.***

*Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Although we routinely compare the facts of different cases to each other to evaluate the relative severity or pervasiveness of the conduct, our precedents require us to examine the specific context in which the conduct occurred on a case-by-case basis." *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1097 n.2 (10th Cir. 1999). Moreover, "**the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact**." *Id.* at 1098 (emphasis added).

Factors to be considered in determining whether the conduct is severe and pervasive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Carrasco*, 2005 WL 1319051 *6 (citing *Harris*, 510 U.S. at 23). Frequency is just one factor in the analysis; an isolated incident may be sufficient if the conduct is severe and threatening. *Id.* To be actionable the conduct must be "both objectively and subjectively abusive." *Id.* In this regard, "the Court must consider not only the effect the discriminatory conduct actually had on plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position." *Ammon v. Baron Automotive Group*, 270 F. Supp. 2d 1293, 1306 (D. Kan. 2003).

Rojas' inappropriate behavior toward Plaintiff, described above, can be viewed by the jury as being both severe and pervasive. Rojas' comments to Plaintiff about her "boyfriends," about her husband performing various sexual acts, about Plaintiff "delivering packages in a halter top and short skirt," about Plaintiff going to a battered women's shelter with her kids, that "being a girl is hard," and that she "shouldn't be a driver" are all humiliating and sexually inappropriate. **AMF 48, 49, 52, 53 & 54.** Rojas' comments to *other* drivers about Plaintiff's

"boyfriends" and about her physical appearance are also humiliating to Plaintiff.   **AMF 44.**

Rojas' disturbing practice of finding Plaintiff on her route on his days off and asking her to lunch

or calling her for no legitimate business reason, interfered with her work performance.   **AMF 50**

**& 51.**   Rojas cornering Plaintiff in the check-in room and yelling at her to speak to him is

physically threatening.   **AMF 55.**   These are not comments and behaviors that are "merely

offensive"; rather, these are humiliating comments which became increasingly threatening over

the course of several months.

### 3.        There Is a Basis For Imputing Liability to Defendant UPS

The last factor challenged by defendant is whether UPS can be liable for the sexual

harassment.

> An employer may be held liable for hostile work environment sexual harassment
> committed by one employee against another if the employer negligently or
> recklessly fails to respond to the harassment. This liability attaches when a
> plaintiff establishes that an employer had actual or constructive notice of the
> hostile work environment and failed to respond adequately to that notice. For
> purposes of Title VII, an employer is deemed to be on notice of a hostile work
> environment if management level employees know about the alleged harassment.

*Ammon*, 270 F. Supp. 2d at 1306 (internal citations omitted).  An employer fails to "respond

adequately" if it "fails to take adequate remedial and preventative responses to any actually or

constructively known harassment."  ***Holmes v. Utah Dept. of Workforce Servs.***, 483 F.3d 1057,

1069 (10th Cir. 2007).

In the beginning of 2007, Plaintiff brought Rojas' behavior to UPS' attention on three

separate occasions.  In January 2007, Plaintiff first spoke to her Center Manager, Keith Wolford,

about Rojas' inappropriate behavior, and Wolford responded by attempting to keep Rojas and

Plaintiff apart while on their routes.  **Defendant's Statement of Uncontroverted Facts (in**

**Doc.62), hereinafter "UF", 23 (undisputed part).**  In March 2007, immediately after Rojas had

cornered Plaintiff in the check-in room, Plaintiff again complained to Wolford, reporting that

Rojas' behavior had become more serious.  **AMF 55; UF 24 (undisputed part).**  Finally, Plaintiff called the UPS hotline on March 14, 2007, to further report Rojas' sexual harassment to UPS.  **UF 26.**  The question of whether UPS is liable for this sexual harassment thus becomes whether UPS "failed to respond adequately."  *See Ammon*, 270 F. Supp. 2d at 1306.

Initially, UPS acted like it was going to respond adequately.  UPS investigated Plaintiff's complaints, determined that Rojas had indeed sexually harassed Plaintiff, and terminated him for it on April 4, 2007.  **AMF 57; UF 27-32.**   Then, UPS determined that Rojas had retaliated against Plaintiff, by placing nude photographs of her on her then-husband's car, and terminated him a second time on April 9, 2007.  **AMF 58; UF 40.**

Despite these initial positive steps, UPS ultimately ended its response to Plaintiff's undoing everything it had done up to that point.  On April 19, 2007, despite finding that Rojas had sexually harassed and retaliated against Plaintiff, UPS management agreed with union representatives to reinstate Rojas to his prior position the following day, without condition, and to pay him for all the days he had been off of work except for the one day for which he had already been paid (April 9, 2007).  **AMF 59 & 60.**  This response was worse than doing nothing, and a reasonable jury can find, on these facts, that UPS failed to adequately respond to Plaintiff's complaints of sexual harassment.  In effect, UPS determined that Rojas had sexually harassed and retaliated against Plaintiff, and then gave him a two-week paid vacation for it.  Defendant claims that it "took the ultimate step to prevent the alleged harassment" by terminating Rojas, **Defendant's Memorandum (Doc.62), p.29**, but the jury can reasonably find that this so-called "ultimate step" was really just a temporary—and ultimately illusory—step before placing Rojas back to work, with back pay, right next to the woman he sexually harassed.  Not only can the

jury find the response to be inadequate, the jury can also reasonably view the response as going beyond non-action against Rojas into affirmative retaliation against Plaintiff.

That Rojas did not thereafter sexually harass Plaintiff does not prevent the jury from finding that Defendant's response was inadequate. Defendant cites ***Adler v. Wal-Mart Stores, Inc.***, for the proposition that "whether the harassment ceases after the employer takes action *may* show the remedy's effectiveness. . . ." **Defendant's Memorandum (Doc.62), p.28** (emphasis added) (citing *Adler*, 144 F.3d 664, 667 (10th Cir. 1998)). However, the *Adler* court recognized also that "stoppage of harassment . . . is not the sole factor to be considered." *Adler*, 144 F.3d at 667. Thus, while a jury is certainly *permitted* to find that stoppage of harassment proves the adequacy of UPS's response, the jury may also properly reach the opposite conclusion: that UPS' response amounted to rewarding Rojas with a two-week paid vacation for sexually harassing and retaliating against Plaintiff.

Furthermore, the Court should not be distracted by Defendant's attempt to shift the blame for its decision to the Union and the CBA by reference to the "Mo-Kan" panel. **Defendant's Memorandum (Doc.62), p.31.** Defendant ignores the fact that half of the Mo-Kan panel is comprised of UPS managers and that any decision of the panel *requires* the agreement of those UPS managers. **AMF 59 & 60; UF 44.** UPS, through its panel members, could have completely refused to reinstate Rojas, or refused to reinstate Rojas unless he agreed to give up his route in the West Center and go to work in one of the three other centers in the James Street facility, but chose not to impose reasonable—indeed *any*—restrictions on Rojas' reinstatement. **AMF 61.** This fact distinguishes this case from the ***Adams*** case cited by Defendant. **Defendant's Memorandum (Doc.62), p.31** (citing ***Adams v. Goodyear Tire & Rubber***, 2000 WL 1310521, *5 (D.Kan. Aug. 25, 2000)). Defendant is essentially arguing that because UPS acted through a

joint decision with the Union, rather than unilaterally, UPS is somehow immunized from liability.  Rather than insisting on *any* conditions of reinstatement, UPS went out of its way at the Mo-Kan panel to make sure that Rojas was put back to work without condition and with full back-pay.  **AMF 59 & 60.**  Calling such action a "one-day suspension" does not change the reality of the situation that UPS went to lengths to make sure Rojas suffered virtually no consequences at all.

Based on the evidence in this case, a reasonable jury can find that UPS did not take adequate remedial and preventative responses to Plaintiff's complaints of sexual harassment. Effectively, the message sent to Rojas and other UPS employees is that UPS will go through the pretext of investigating and terminating an employee that sexually harasses a coworker, but will then agree with the Union to reinstate the employee with full pay for any time off.  A reasonable jury can find that this does not even amount to a slap on the wrist, much less the 'adequate response' required by Title VII.

### 4.   <u>Conclusion for Sexual Harassment Claim</u>

In conclusion, the facts in the record create genuine issues of material fact on each aspect of Plaintiff's sexual harassment claim.  For this reason, summary judgment is inappropriate on her sexual harassment claim.

### C.   <u>RETALIATION</u>

With respect to Plaintiff's retaliation claim, Defendant attempts to sow doubt as to Plaintiff's ability to show that she was "subject to actions that are considered materially adverse" and that there is "a causal connection between any protected activity and UPS' actions. . . ." **Defendant's Memorandum (Doc.62), p.32.**  Defendant also argues that there is an can be no genuine issue as to whether the so-called "legitimate, non-discriminatory reason[s] for the employment actions taken with respect to Plaintiff" are in fact pretext.  *Id.*  Defendant's doubt-

sowing efforts notwithstanding, there is sufficient evidence in the record from which a reasonable jury can find that Plaintiff has met her burden of proof on the "materially adverse" and "causal connection" elements, as well as showing that Defendant's reasons for taking actions against her are mere "pretext."   Thus, genuine issues of material fact preclude summary judgment on Plaintiff's retaliation claim.

### 1.   UPS Took Materially Adverse Actions Against Plaintiff

For purposes of a retaliation claim, actions against an employee are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006), 126 S.Ct. 2405.  To be materially adverse, a retaliatory action *need not* be related to the "compensation, terms, conditions, or privileges of employment." *Id.* at 61 (internal quotation marks omitted).   In fact, "[a] employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Id.* at 63 (emphasis in original).   "Whether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (internal quotation marks omitted).  For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Id.*   Additionally, requiring an employee to "spend more time performing the more arduous duties [in the employee's job description] and less time performing those that are easier or more agreeable" can be a form of materially adverse action. *Id.* at 70-71.

Defendant cites a string of pre-*Burlington Northern* cases that do not adequately reflect this standard.  **Defendant's Memorandum (Doc.62), p. 32-33.**  For example, Defendant cites

*Wells v. Colorado Dept. of Transportation* for the proposition that "undesirable or difficult job assignments within an employee's work description generally fail to constitute adverse employment actions." *Id.* at 33 (citing *Wells*, 325 F.3d 1205, 1215-16 (10th Cir. 2003)). Such a statement is directly contrary to the teachings of *Burlington Northern* that more arduous duties, even if already in an employee's job description, can be materially adverse. *See Burlington Northern*, 548 U.S. at 70-71. Similarly questionable in light of *Burlington Northern* is Defendant's argument that "[d]erogatory comments or rude behavior, without more, do not constitute adverse employment actions." **Defendant's Memorandum (Doc.62), p.**33 (citing *Amro v. Boeing Co.*, 232 F.3d 790, 795, 798 (10th Cir. 2000)). On the contrary, *Burlington Northern* makes clear that whether such actions are materially adverse can only be determined by "considering all the circumstances." *Burlington Northern*, 548 U.S. at 71.

Defendant also misreads the "materially adverse" standard to require *this Plaintiff* to have been dissuaded from making a charge of discrimination, a reading that would necessarily prove fatal to *all* retaliation lawsuits. Indeed, "Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses." *Id.* at 67. The "materially adverse" standard "refer[s] to reactions of a *reasonable* employee because [the] standard for judging harm must be objective"; this is to "avoid[] the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *Id.* at 68-69. Thus, plaintiff's subjective feelings about the adverse actions, and whether they actually dissuaded her from making or supporting a charge of discrimination is completely *irrelevant* to the objective "materially adverse" determination. *All* lawsuits for retaliation in violation of Title VII must necessarily involve plaintiffs who were not, in fact, dissuaded from filing and supporting a charge of discrimination. It goes completely against the

interests of public policy, and the Supreme Court's standard in ***Burlington Northern*** to suggest that the filing a retaliation charge could be the very thing that defeats a retaliation lawsuit.

In this case, Plaintiff's retaliation claim is based on actions by UPS that could well dissuade a reasonable worker from filing or supporting a charge of discrimination. Even before UPS' completed its investigation of Rojas, UPS management embarked on its path of retaliatory actions against Plaintiff by directing Plaintiff's supervisors to undermine and discredit Plaintiff's work performance. For example, on March 30, 2007, Rajeev Jain, one of the West Center's on-car supervisors, told one of Plaintiff's coworkers, Nathan Williams, that he had been instructed to watch Plaintiff and write her up for everything. **AMF 63.** While Jain did not tell Nathan Williams who had given him that instruction, the jury can reasonably infer that it was one of Jain's superiors, either West Center Manager Keith Wolford or Division Manager Jamie Diaz. Wolford gave a nearly identical instruction to Cheryl Hatton, then Plaintiff's on-car supervisor, to write up Plaintiff up for every little thing and give Plaintiff warning letters even if that was not the proper step in progressive discipline. **AMF 64.** Then, when Hatton changed positions to be the dispatch supervisor for the West Center, Diaz told her to change Plaintiff's dispatch in ways that made it impossible for Plaintiff to run her route in a timely fashion, and to hold Plaintiff accountable for every little number mistake or dispatch mistake. **AMF 73.** From these instructions from UPS managers to unreasonably and unfairly discipline Plaintiff, a reasonable jury can infer that UPS management wanted to make life difficult for Plaintiff or create pretextual reasons to terminate her employment, in retaliation for her complaints about sexual harassment.

These instructions from UPS management to Plaintiff's supervisors resulted in retaliatory treatment so blatant that it was observed by Plaintiff's coworkers and at least one of her

supervisors.  Nathan Williams, a long-time UPS driver who was a cover driver in the West Center in 2006 and 2007, observed Plaintiff being treated like a normal employee before her complaints and treated with a lot of hostility from supervisors and dispatch personnel after she complained about Rojas.  **AMF 65.**  Maurice Poindexter, another long-time UPS driver present in the West Center in 2006 and 2007, witnessed West Center supervisors treating Plaintiff differently than other drivers after she complained about Rojas, including: over-dispatching Plaintiff's route and talking to her in a way more offensive than they would with other drivers.  **AMF 74 & 75.**  After Rojas was reinstated, Cheryl Hatton, then Plaintiff's on-car supervisor, noticed dispatch giving Plaintiff lots of extra stops on her route that she should not have had.  **AMF 71.**  Nathan Williams also noticed that Plaintiff's route was being dispatched in ways that made it more difficult to run after she complained about Rojas' sexual harassment.  **AMF 72.**  As described above, changes in a plaintiff's work assignments to make her duties more arduous, even if already in her job description, can be reasonably viewed by the jury as being materially adverse.  ***Burlington Northern***, 548 U.S. at 70-71.  Where, as here, such increases in hostility from supervisors and increases in the difficulty of work assignments are brought about because of Plaintiff's complaints of sexual harassment, they can be viewed by a reasonable jury as materially adverse, retaliatory actions.

In addition to increased hostility and increased workload, UPS supervisors and managers found other ways to make it more difficult for Plaintiff to do her job.  One week after Rojas was reinstated, Plaintiff received an inappropriate, sexual text message from Phil Hoetzel, one of her supervisors. She reported this retaliation to Division Manager Jamie Diaz.  **AMF 68.** Approximately one week after that, West Center Manager Keith Wolford told Plaintiff that he was, on orders from Division Manager Jamie Diaz, changing her start time to be ten minutes

earlier.  **AMF 70.**     Approximately eight months earlier, Wolford had moved Plaintiff's start time back by ten minutes to allow her time to take her children to school before coming to work, after she had separated from her then-husband.   **AMF 69**.   Thus, this is a situation, like that described in ***Burlington Northern***, where the jury could reasonably find that such a change in start time was materially adverse.   *See **Burlington Northern***, 548 U.S. at 71 ("A schedule change . . . may matter enormously to a young mother with school age children.").   Furthermore, the jury can infer from the temporal proximity between Plaintiff's complaints and these actions that they were made in retaliation for her complaints.

Unfortunately for Plaintiff, the hostility from UPS management was not short lived.  Approximately ten weeks after Rojas was reinstated, Division Manager Jamie Diaz, on June 21, 2007, had a meeting with Plaintiff regarding an injury she had sustained on the job; in that meeting, he told plaintiff that she needed to "get over it and move on" with regard to Rojas continuing to work in the same center as her.   **AMF 77 & 78.**   The jury can reasonably infer from this comment that Diaz was frustrated by Plaintiff's complaints and did not care that it was extremely stressful for Plaintiff to have to work in the same center as the man who sexually harassed her.   In fact, Diaz testified to his belief that Plaintiff is partially at fault for Rojas sexually harassing her, merely because Diaz believed that Plaintiff was having extramarital affairs.  **AMF 62.**   From this, the jury can further infer that Diaz believes Plaintiff *deserves* to work in a stressful and hostile work environment, and that Diaz had no intention of doing anything to minimize the contact between Plaintiff and the man who sexually harassed her.

Plaintiff included Diaz's "get over it and move on" comment in her July 7, 2007 amendment to her original EEOC Charge of Discrimination, and that caused Diaz to become even more hostile toward Plaintiff.   Once Diaz learned that Plaintiff had quoted him in her

amended charge, Diaz told Plaintiff that he was "concerned about how she took [their] conversations out of context and that excerpts seemed to be winding up on complaints filed by her with government agencies." **AMF 78 & 79.** Diaz then came up with an additional way to treat Plaintiff differently than his other employees: he made it his personal policy to either have a witness present or to take notes for all conversations he had with Plaintiff from that point forward. **AMF 79.** This is an *explicit* admission from a high-level UPS manager that he was treating Plaintiff differently *because of* her EEOC complaints; such evidence would allow a jury to reasonably find that there is a causal nexus between Plaintiff's complaints and Diaz' materially adverse actions against her.

Approximately two weeks after Diaz made his "get over it" comment to Plaintiff, UPS moved Plaintiff's package car from the front of the center to a spot immediately adjacent to Rojas' package car. **AMF 80.** Although Plaintiff complained about the placement to her immediate supervisors, her Center Manager, and Division Manager Jamie Diaz, they all refused to change the placement or even give her an explanation for the change. **AMF 81 & 82.** Considering the background of Rojas sexually harassing Plaintiff, a jury could reasonably find that this kind of change in Plaintiff's work environment was materially adverse because it forced Plaintiff to be in even closer proximity to Rojas on a daily basis, making her working environment even more stressful. Furthermore, Diaz' admission of retaliatory intent would allow a jury to find this action to be retaliation for her complaints.

UPS management's retaliatory harassment of Plaintiff found renewed vigor after the parties participated in a meeting with the EEOC on September 27, 2007. The very next day, Plaintiff was taken into an office with several UPS managers, without being allowed to have a union steward present, where one of the HR Manager demanded that Plaintiff explain why she

had made her retaliation claims.  **AMF 83-92.**  The HR Manager raised his voice at Plaintiff, told her "I don't care about your stupid lawyer," and was obviously frustrated with her.  **AMF 89 & 90.**  From these facts alone, a jury could reasonably find that this incident constituted a "materially adverse" action that could very well dissuade a reasonable worker, but the circumstances went beyond hostile to intimidating.  When Plaintiff entered the office, the windows had been blocked out, and one of the managers blocked the door with his chair and prevented Plaintiff's coworkers from entering the room when they came to her aid.  **AMF 85 & 91.**  When Plaintiff became upset and asked to leave, the HR Manager told her only that "We're almost done here."  **AMF 90.**  Such circumstances are not just hostile, but actually approach the tort of false imprisonment.  *See Thompson v. General Finance Co.*, 468 P.2d 269, 280 (Kan. 1970) ("In an action for false arrest or false imprisonment, all that is necessary is that the individual be restrained of his liberty without any sufficient legal cause therefor, and by words or acts which the one being restrained fears to disregard.").  At the very least, the jury can reasonably find that forcing Plaintiff to enter and remain in such an intimidating and hostile situation is a "materially adverse action."

In the month after this intimidating meeting with UPS management, Division Manager Jamie Diaz continued his retaliation against Plaintiff.  On October 8, 2007, Diaz followed Plaintiff while she was shuttling packages from the James Street facility out to another driver, approached her while she was parked at a gas station, and yelled at her unnecessarily.  **AMF 93.**  The jury can infer from this that Diaz' intent was merely to harass Plaintiff, in retaliation for her complaints to the EEOC.  Approximately a week later, Plaintiff's on-car supervisor at the time, Doug O'Millian, offered to move Plaintiff's start time back a few minutes to minimize the chance that she would encounter Rojas every day.  **AMF 94.**  However, after O'Millian changed

Plaintiff's start time on the schedule, Diaz told O'Millian that he had to change Plaintiff's start time back to the same time that Rojas started. **AMF 94.** Considering Diaz' now lengthy history of making Plaintiff's work environment more stressful following her complaints, and Diaz' belief that plaintiff all but invited Rojas to sexually harass her, the jury can interpret this action as continuing retaliation against Plaintiff.

UPS' hostility toward Plaintiff again surfaced in the weeks after Plaintiff filed her second Charge of Discrimination and the Complaint that instituted this lawsuit, on January 23, 2008. **AMF 96.** UPS was served with a copy of the Complaint on February 1, 2008. **AMF 97.** On February 7, 2008, Division Manager Jamie Diaz met with Plaintiff and told her: "due to the trouble you are causing outside, you are skating on thin ice" and "you are playing games." **AMF 98.** Because of the timing of this statement, the jury can reasonably infer that Diaz was angry about and referring to Plaintiff's recently filed Charge of Discrimination and/or her recent filing of this lawsuit. One week later, when Plaintiff filed a grievance complaining that Diaz' comments were retaliatory, Diaz threatened to terminate Plaintiff's employment. **AMF 99 & 100.** After Diaz threatened Plaintiff, she was taken into the office by Mike Bayers, who was the acting center manager that day, and issued three write-ups with warning letters to follow, on issues for which Plaintiff had not been disciplined previously. **AMF 100.** The jury can reasonably infer that Diaz instructed Bayers to issue the write-ups to Plaintiff in retaliation for Plaintiff complaining about Diaz' retaliatory comments the week before. Furthermore, the jury can find such actions to be materially adverse because they involve threats to Plaintiff's employment.

Diaz' attempts to create pretextual reasons to terminate Plaintiff's employment did not stop there. Sometime in the first half of 2008, District Manager Jamie Diaz called Plaintiff's on-

car supervisor at the time, Sue Richardson, the evening before Plaintiff had an approved personal day off and told Richardson to instruct Plaintiff to come in the next day and then fire her immediately if she did not come in to work. **AMF 101 & 102.** Diaz is not ordinarily involved in choosing which drivers are asked to come back to work when there is a driver shortage, because it is the supervisors who take care of staffing and days off. **AMF 103.** Richardson was upset by Diaz' instruction and did not think it was the right thing to do because Plaintiff had gotten approval for the personal day off from the center manager at the time, Rudy Rhodes; so, instead of following Diaz' instructions, Richardson called Brad Williams, Employee Relations Manager for UPS, who agreed with Richardson and told her not to call Plaintiff. **AMF 104.** Diaz testified that he "might have been" upset with Richardson for going behind his back and contacting human resources. **AMF 105.**

> ## 2.      There Is a Causal Connection Between Plaintiff's Complaints About Sexual Harassment and UPS' Adverse Actions Against Plaintiff

With respect to the causal connection element, "[a] retaliatory motive may be inferred when an adverse action closely follows protected activity." ***Anderson v. Coors Brewing Co.***, 181 F.3d 1171, 1179 (10th Cir. 1999). In determining the date of the protected activity, the Court uses "the date most favorable to [the plaintiff]." ***Id.*** "[A] one and one-half month period between protected activity and adverse action may, by itself, establish causation[; but,] a three month-period, standing alone, is insufficient to establish causation." ***Id.*** (internal citations omitted). However, "the passage of time does not necessarily bar a plaintiff's retaliation claim if *additional* evidence establishes retaliatory motive. Other evidence in the record could establish an adverse employment action taken after a lengthy period of time was still in response to the earlier, protected activity. . . ." ***Piercy v. Maketa***, 480 F.3d 1192, 1198-99 (10th Cir. 2007) (emphasis in original).

The plaintiff in ***O'Neal v. Ferguson Const. Co.***, 237 F.3d 1248, 1254 (10th Cir. 2001) presented facts sufficient to demonstrate a causal connection between his complaints of discrimination and retaliation.  After his complaint, work was taken away from the plaintiff and reassigned to another employee who did not have time to perform the work.  That employee told the plaintiff that he did not understand why the company was rerouting the work to him because he barely had time to do his normal work assignments.  Additionally, after complaining the company reduced the plaintiff's hours.  The plaintiff also presented evidence that his hours were reduced.  Two other employees testified that other employees had not been sent home without work or had their hours reduced.

The plaintiff in ***Rahn v. Junction City Foundry, Inc.***, 161 F. Supp. 2d 1219, 1238 (D. Kan. 2001) also produced evidence sufficient to demonstrate a causal connection between her complaints and the retaliation she suffered.  She submitted evidence that after she complained other employees spread rumors that she was sleeping with a co-worker, that she was pregnant with his child and the company had paid her off.  The alleged harasser spread word that he would "kill her" if he was fired as a result of her complaints.  The company asserted that she could not demonstrate retaliation because she could not show that any supervisory or management personnel had orchestrated or knew about the retaliation.  The plaintiff had, however, reported some of the acts of co-worker retaliation to management and the company took no action.  She alleged that the company knew that co-workers were harassing her and that her supervisor had disciplined her for conduct that he had previously not criticized.  The court determined that the plaintiff had submitted sufficient evidence that the company had made her working conditions so intolerable that a reasonable person in her position would have felt compelled to leave her employment.  The court concluded that "plaintiff produced evidence on which a jury could find

that the sexually hostile work environment triggered her complaints and that after she complained, other co-workers and supervisors engaged in retaliatory conduct. The causal connection between the protected activity and the adverse action is inherent in the alleged retribution." *Rahn*, 161 F. Supp. 2d at 1238.

In this case, some of the retaliatory actions UPS took against Plaintiff occurred within just a few weeks of her complaints about sexual harassment and retaliation, and on those grounds alone can establish the causal connection.  UPS management's instructions to discipline Plaintiff more harshly and increase the workload on her dispatched route began within two weeks of her complaints.  **AMF 63[2] & 64.**  Six weeks after her complaints, she received a sexual text message from a supervisor and reported the retaliation to Division Manager Diaz.  **AMF 68.**  And one week after that, Diaz changed Plaintiff's start time, revoking an agreement that had been in place for some eight months without incident or complaint.  **AMF 69 & 70.**  These actions all fall within the time frame for temporal proximity alone to establish a causal connection.  *See Anderson*, 181 F.3d at 1179 ("a one and one-half month period between protected activity and adverse action may, by itself, establish causation" but "a three-month period, standing alone, is insufficient to establish causation").  In addition to temporal proximity, Plaintiff's coworkers and one of her supervisors have testified that Plaintiff was disciplined more harshly and her workload was increased *only after she complained* to Defendant about Rojas sexually harassing her.  **AMF 65, 71, 72, 74 & 75.**

Even after this time period, Division Manager Diaz's adverse actions against Plaintiff have their own causal connection to Plaintiff's complaints of sexual harassment and retaliation.

---

[2] Jain's admission to Nathan Williams that he (Jain) was told to watch Plaintiff and write her up for everything is not "double hearsay," as Defendant claims.  *See* **Defendant's Memorandum, p.44.**  Both Jain and his superior who instructed him are supervisors or managers of Defendant, **AMF 8 & 19**; therefore, both statements count as an "admission by party-opponent" and are "not hearsay."  *See* **FRE 801(d)(2) & 805.**

Diaz has admitted that he thinks Plaintiff is at fault for Rojas' sexual harassment of her, and he has told her to "get over it and move on."  **AMF 62, 77 & 78.**  Diaz has further admitted that, after Plaintiff specifically mentioned Diaz in her July 2007 amendment to her Charge of Discrimination, he began treating her differently from drivers who had not mentioned him in an EEOC charge.  **AMF 79.**  These admissions demonstrate the causal connection between Plaintiff's complaints and Diaz' adverse actions against Plaintiff in July 2007, October 2007, February 2008, and later in 2008.

The causal connection can also be seen in UPS management's hostility to Plaintiff pursuing her charges of discrimination with the EEOC and in this Court.  In September 2007, the day after the parties had a meeting with the EEOC, the District Human Resources Manager interrogated Plaintiff about why she had filed retaliation claims with the EEOC and exhibited so much hostility toward Plaintiff that he made her cry and concerned her coworkers, including her immediate manager.  **AMF 83-92.**  Although Defendant claims this "meeting was an attempt by the Company to address any retaliation Plaintiff felt she was still suffering," **Defendant's Memorandum (Doc.62), p.44**, the jury is not required to believe this self-serving explanation; considering the hostile nature of the meeting and the temporal proximity to the meeting at the EEOC, the jury can reasonably infer that Defendant actually sought to intimidate Plaintiff into dropping her charges of discrimination and retaliation against UPS.  Then, in February 2008, immediately after UPS had been served with the Complaint that initiated this lawsuit, Division Manager Diaz told Plaintiff: "due to the trouble you are causing outside, you are skating on thin ice" and "you are playing games."  **AMF 97 & 98.**  These incidents constitute further proof that UPS is harassing Plaintiff in retaliation for her complaints about sexual harassment and

retaliation, for pursuing her rights in proceedings with the EEOC, and for pursuing her rights in the instant lawsuit.

From these facts, and others discussed in the previous section, the jury can reasonably find a causal connection between Plaintiff's protected activities and the numerous adverse actions taken against Plaintiff since March of 2007.

### 3. UPS' Proffered Reasons For Its Adverse Actions Against Plaintiff Are Pretext For Retaliation

To establish pretext, a plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). In conducting its analysis of pretext, the court "must" consider circumstantial evidence in its totality. *See Simms v. Oklahoma ex rel. Department of Mental Health & Subs. Abuse Servs.*, 165 F.3d 1321, 1331 (10th Cir. 1999); *see also Voltz v. Coca-Cola Enterprises Inc.*, 2004 WL 100507 at *9 (10th Cir. 2004). Moreover, in analyzing the issue of pretext, the trier of fact may consider evidence establishing the plaintiff's prima facie case of retaliation and the inferences drawn therefrom. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

The court in *O'Neal*, 237 F.3d at 1254, held that the plaintiff's evidence regarding causal connection could also be considered with respect to showing pretext. The Court further ruled that the evidence was sufficient for the issue of pretext to go to the jury. Plaintiff had asserted that in retaliation for his complaints of discrimination the employer had reduced his hours and taken work away from him. In response to the company's articulated legitimate reason for the

actions taken, the plaintiff testified that his hours had been reduced while work was being assigned to another employee who did not have time to perform the extra work.  Two other employees testified that they were not aware of other employees being sent home without work or having their hours reduced.

Although Defendant claims that "[n]on-pretextual reasons for each of the actions she complains of have been provided[,]" its Memorandum does not clearly illustrate what these reasons are, but merely refers back to the section of its Argument discussing the materially adverse actions taken against Plaintiff.  **Defendant's Memorandum (Doc.62), p.46**.  Because of this, Plaintiff has attempted to refute Defendant's allegedly non-discriminatory explanations throughout the previous two sections on the "materially adverse actions" element and the "causal connection" element.  *See supra*, sections II.C.1 & II.C.2; *see also Reeves*, 530 U.S. at 143 (the trier of fact may consider evidence establishing the plaintiff's prima facie case of retaliation).

Nevertheless, several striking examples of the weakness and incoherency of Defendant's proffered reasons will be discussed here in more detail.  Perhaps most striking is that plaintiff's coworkers and supervisors observed the harsh treatment of Plaintiff beginning after her complaints about Rojas, even though her work performance had not changed; Plaintiff's coworkers dismissed the proffered non-discriminatory explanations given for those retaliatory actions, and a jury can reasonably do the same.  **AMF 10, 11, 63-65 & 71-75.**  Also striking is Diaz' admission that he treated Plaintiff differently because of her complaints about sexual harassment and retaliation.  **AMF 79.**  Defendant's attempted justification for changing Plaintiff's start time soon after she complained about sexual harassment fails to account for the undisputed fact that the arrangement had been in place for some eight months without incident or complaint.  **AMF 69 & 70.**  Likewise, Defendant's attempts to justify its action in moving

Plaintiff's package car from the front of the center to a position immediately next to Rojas' package car similarly ignore the facts that her package car had been located at the front of the center for several months and that package cars are *not* always grouped together by geographic area. **AMF 80-82.**

As explained here and in the two prior sections, Defendant simply does not have good reasons for its harassing, retaliatory actions against Plaintiff. On the evidence presented in this case, a jury can reasonably conclude that Defendant's explanations are merely pretext for its true, retaliatory intentions.

    **4.**    **<u>Conclusion for Retaliation Claim</u>**

In conclusion, the facts in the record create genuine issues of material fact on each aspect of Plaintiff's retaliation claim. For this reason, summary judgment is inappropriate on her retaliation claim.

**D.**    **<u>CONCLUSION</u>**

There are genuine issues of material fact on each aspect of both Plaintiff's sexual harassment claim and Plaintiff's retaliation claim. For this reason, summary judgment is inappropriate on both claims, and Defendant's Motion for Summary Judgment should be denied.

|  |  |
|---|---|
|  | **THE MEYERS LAW FIRM, LC** |
| By: | /s/ Luke R. Hertenstein |
|  | Martin M. Meyers    KS #14416 |
|  | mmeyers@meyerslaw.com |
|  | Andrew H. McCue    KS Fed. #78153 |
|  | amccue@meyerslaw.com |
|  | Luke R. Hertenstein   KS #23809 |
|  | lhertenstein@meyerslaw.com |
|  | 222 W. Gregory Blvd. |
|  | Suite 340 |
|  | Kansas City, Missouri  64114 |
|  | (816) 444-8500 |
|  | (816) 444-8508 *facsimile* |
|  | ATTORNEYS FOR PLAINTIFF |

## **CERTIFICATE OF SERVICE**

  The above and foregoing was served via the Court's ECF system this 27th day of May, 2009 on:

Laurence R. Tucker, Esq.
Melody L. Nashan, Esq.
Armstrong Teasdale, LLP
2345 Grand Boulevard, Suite 2000
Kansas City, Missouri 64108-2617
lrtucker@armstrongteasdale.com
mnashan@armstrongteasdale.com


         /s/ Luke R. Hertenstein
           Luke R. Hertenstein