# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Lisa Turrentine,**

        **Plaintiff,**

v.                                         **Case No. 08-2042-JWL**

**United Parcel Service, Inc.,**

        **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Lisa Turrentine filed suit against her employer, United Parcel Service, Inc. ("UPS"), alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This matter comes before the court on defendant's motion for summary judgment (doc. 61). As will be explained, the motion is granted with respect to plaintiff's sexual harassment claim and is granted in part and denied in part with respect to plaintiff's retaliation claims..

### I.      Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Plaintiff Lisa Turrentine has been employed by UPS since 2000. Beginning in January 2006, plaintiff gained full-time employment with UPS as a "package car driver" in the West Center of UPS's James Street facility. Package car drivers at UPS are drivers who pick up and deliver packages to UPS customers along the driver's established route. After successfully completing a training route and a "cover" route, plaintiff was assigned to her

prescribed route at the end of April 2006.  Ultimately, plaintiff bid on and was awarded this same route and she remains on that route today.[1]

Plaintiff's claim of sexual harassment in this case is based solely on the conduct of one of her coworkers, Mario Rojas, another package car driver for UPS.  Plaintiff first met Mr. Rojas in early 2006 and they appear to have had daily contact with one another, either in the facility's check-in area[2] or in the context of driving their routes.[3]  According to plaintiff, Mr. Rojas's sexually harassing conduct began in May 2006 and continued until April 2007.  Specifically, she contends that Mr. Rojas frequently asked plaintiff whether "one of her boyfriends" was going to drive her home from work or otherwise inquired as to how plaintiff was going to get home; that he made two sexual references concerning the fact that plaintiff was married to an African-American; that he told plaintiff on one occasion that he had dreamed that she made her deliveries wearing a short skirt and a halter top; that he told plaintiff on one occasion that he had dreamed that he had rescued plaintiff and her children from a battered women's shelter;[4] and that on one

---

[1]UPS and the International Brotherhood of Teamsters have entered into a collective bargaining agreement that governs the rights and obligations of UPS's package car drivers.  Local Union 41 of the Teamsters represents the package car drivers at UPS's James Street facility.

[2]Prior to their assigned driving time, package car drivers in the West Center of the James Street facility congregate in the facility's check-in area to clock in and receive any necessary information about the upcoming work day.

[3]Plaintiff's route is adjacent to Mr. Rojas's established route and their routes would sometimes overlap depending on the delivery volume of any given day.

[4]It was apparently well known amongst plaintiff's coworkers that plaintiff was physically abused by her husband, whom she has since divorced.

occasion when Mr. Rojas was not working, he appeared on her route to "watch" her make deliveries and ask her to have lunch with him.  In addition, plaintiff testified that on two occasions Mr. Rojas made vulgar gestures about other women and she testified that her coworkers advised her that Mr. Rojas was telling UPS employees that plaintiff was "sleeping around" with other drivers.  Plaintiff does not contend that Mr. Rojas ever touched her in an inappropriate manner.  In other words, her claim is based exclusively on Mr. Rojas's unwelcome verbal conduct.

Plaintiff did not complain to UPS about Mr. Rojas's conduct at any time during 2006. She did tell Cheryl Hatton, her supervisor at the time, that she was "uncomfortable" with a situation concerning one of her coworkers, but she did not identify Mr. Rojas despite Ms. Hatton's clear invitation that she do so.  Ms. Hatton advised plaintiff that if plaintiff wanted to discuss the matter further, Ms. Hatton would listen to her.  In January 2007, Keith Wolford, UPS's Business Manager for the West Center of the James Street facility, had occasion to be on Mr. Rojas's route and Mr. Rojas asked Mr. Wolford to have plaintiff call him.  According to plaintiff's testimony, Mr. Wolford did not understand why Mr. Rojas would want plaintiff to call him on route and so Mr. Wolford approached plaintiff to inquire about the reason that Mr. Rojas was trying to contact plaintiff.  At that point, plaintiff told Mr. Wolford "everything" that she had experienced with respect to Mr. Rojas.

In response, Mr. Wolford apologized to plaintiff and expressed his concern that she had not felt comfortable coming to him with the information earlier.  He promised plaintiff that he would make sure that Mr. Rojas had no communication with plaintiff on route.  He further told

plaintiff to "be sure and talk to him" if she felt like the situation was getting worse.  According to Mr. Wolford, plaintiff specifically asked Mr. Wolford not to take her complaint to human resources.  According to plaintiff's testimony, the next event of any consequence that occurred between her and Mr. Rojas occurred on March 14, 2007, when Mr. Rojas allegedly cornered plaintiff in the check-in area and demanded to know why plaintiff was ignoring him.[5]  After this confrontation, plaintiff again complained to Mr. Wolford, telling him that she thought the situation was getting worse and that she felt that "maybe [Mr. Wolford] or somebody should talk to [Mr. Rojas].  In response, Mr. Wolford asked whether plaintiff felt comfortable to drive her route that day (she responded that she did) and he sought and received plaintiff's permission to bring her complaint to the attention of certain UPS managers.  Indeed, he relayed her complaint to UPS's Kansas District Human Resources Manager later that day.

Within two days of her complaint, plaintiff was interviewed by several members of UPS management and, over the course of the next two weeks, UPS interviewed numerous other UPS employees, including Mr. Rojas.  Mr. Rojas denied engaging in any harassing behavior.  Nonetheless, at the conclusion of its investigation, UPS concluded that Mr. Rojas's conduct toward plaintiff as well as other employees (conduct that came to light during the investigation) violated the company's policy prohibiting sexual harassment.  UPS terminated Mr. Rojas's employment on April 4, 2007.  Mr. Rojas filed a grievance that same day protesting his

---

[5]According to plaintiff, the only arguably inappropriate conduct engaged in by Mr. Rojas from the time she complained in January 2007 through March 14, 2007 is that Mr. Rojas complained to UPS management about how poorly plaintiff kept up her UPS vehicle.

termination and also allegedly left a package on the car of plaintiff's husband containing photographs of plaintiff as well as a cell phone with additional photographs of plaintiff, some of which depicted plaintiff naked.

On April 9, 2007, a local hearing was held regarding Mr. Rojas's grievance. The union's position at the hearing was that Mr. Rojas should be reinstated and UPS's position was that Mr. Rojas's termination was warranted. Moreover, during the hearing, UPS terminated Mr. Rojas's employment a second time based on its subsequent determination that Mr. Rojas had placed nude pictures of plaintiff on the car of plaintiff's husband at his workplace. On April 16, 2007, a local hearing was held regarding Mr. Rojas's grievance protesting his second termination. Again, the union requested that Mr. Rojas be reinstated and UPS refused to reinstate Mr. Rojas, maintaining that his termination was warranted.

Because the parties deadlocked in their negotiations concerning both grievances, a hearing was held before the Mo-Kan panel on April 19, 2007. Pursuant to the collective bargaining agreement, the Mo-Kan panel hears grievances of union members that are not resolved in local hearings and the decision of the majority of the panel hearing the case is binding on the parties. The Mo-Kan panel is comprised of equal numbers of Union representatives and Company representatives but the specific members of the panel differ depending on which local union and Company district is involved. Management panel members must be from a different state and union panel members must be from a different local union than those who are involved in the grievance. With respect to Mr. Rojas's grievances, the management panel members were from Missouri and the union panel members were from Local

5

Union 688 and Local Union 245.

During the Mo-Kan panel hearing, UPS continued to advocate for Mr. Rojas's termination. Nonetheless, after hearing all the evidence before it, a majority of the Mo-Kan panel determined that Mr. Rojas's termination should be reduced to a one-day suspension with no other conditions placed upon his reinstatement. Pursuant to the collective bargaining agreement, then, Mr. Rojas was returned to the position and route that he held at the time of his termination. There is no evidence in the record that Mr. Rojas has engaged in any inappropriate behavior with respect to plaintiff at any time since his reinstatement.

According to plaintiff, UPS began retaliating against her immediately upon Mr. Rojas's reinstatement. She asserts that UPS began to "overdispatch" plaintiff's route, making it difficult for her to complete her route in a timely fashion and that her supervisors were instructed to excessively scrutinize her work performance by "writing her up" for even minor infractions. In early May 2007, Mr. Wolford advised her that he was no longer able to honor an agreement that UPS had made with plaintiff which permitted her to start her shift at 8:50am rather than 8:40am, an arrangement which had been in place for nearly nine months in light of plaintiff's child care situation. She contends that one of her supervisors refused to communicate with plaintiff after she complained about Mr. Rojas's conduct and that another supervisor would only communicate with her if a third party was present. In July 2007, UPS decided to switch the location of plaintiff's package car for purposes of loading activity in the morning such that plaintiff's package car was moved immediately adjacent to Mr. Rojas's car, which in turn caused plaintiff increased discomfort because of her proximity to Mr. Rojas.

6

In September 2007, UPS managers "ambushed" plaintiff in a behind-closed-doors meeting in which a Human Resources manager pressed plaintiff about her claims of retaliation before the EEOC, raised his voice to her and referred to her lawyer as "stupid." In October 2007, plaintiff's new supervisor, after learning about plaintiff's history with Mr. Rojas, offered to push plaintiff's start time back by thirty minutes so that she could avoid seeing Mr. Rojas in the mornings. Within a week, the supervisor advised plaintiff that he had been instructed that he could not permit her to do that and he reneged on his promise. Finally, she contends that another supervisor, Jamie Diaz, attempted to terminate her employment after she complained about retaliation by having her subjected to unwarranted disciplinary write-ups; and attempted to deny her approved personal leave. Nonetheless, plaintiff remains employed with UPS today as a full-time package car driver.

Additional facts will be related, as necessary, in connection with the court's analysis of defendant's motion and plaintiff's particular claims.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3*

*Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).  A fact is "material" when "it is essential to the proper disposition of the claim."  *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof."  *Garrison v. Gambro, Inc*., 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III.     Sexual Harassment Claim

8

In the pretrial order, plaintiff asserts that Mr. Rojas's conduct toward her created a sexually hostile work environment in violation of Title VII and that UPS's inadequate response to Mr. Rojas's harassment renders UPS liable to plaintiff for the harassment. Defendant moves for summary judgment on the plaintiff's sexual harassment claim on the grounds that plaintiff has not established that the harassment was "based on sex;" that she has not come forward with evidence of sexual harassment sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment; and that she cannot establish UPS's liability for the harassment. As will be explained, the court concludes that UPS cannot be held liable for Mr. Rojas's harassment because its response to the harassment was prompt, adequate and effective as a matter of law. Because the court finds the liability issue dispositive, it declines to address UPS's remaining arguments.

As plaintiff alleges harassment by a coworker, it is undisputed by the parties that the only potential basis for UPS's liability is its negligence in allowing Mr. Rojas to engage in sexual harassment. *See Scarberry v. Exxonmobil Oil Corp*., 328 F.3d 1255, 1257 (10th Cir. 2003); *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 673 (10th Cir. 1998). Under this theory of employer liability, plaintiff "must establish that the employer had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment." *Adler,* 144 F.3d at 673. Stated another way, employer negligence in this context is "failing to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known." *Id.* (citations omitted). "Because an employer is only potentially liable for negligence in remedying and

9

preventing harassment of which it negligently failed to discover, courts must make two inquiries: first, into the employer's actual or constructive knowledge of harassment, and second, into the adequacy of the employer's remedial and preventative responses to any actually or constructively known harassment."

A.      UPS's Knowledge

An employer is only obligated to respond to harassment of which it actually knew, or in the exercise of reasonable care should have known.  *Id.*  Plaintiff does not contend that UPS knew about Mr. Rojas's harassment prior to January 2007, when plaintiff first discussed the situation with Mr. Wolford.  As the parties concede, then, the question of whether UPS is liable for Mr. Rojas's harassment turns only on the adequacy of UPS's response to the harassment beginning in January 2007 when plaintiff first reported the harassment.

B.      UPS's Response

The "touchstone" for measuring an employer's response to sexual harassment is reasonableness.  *Id.* at 675-76.  An employer is not strictly liable for all harassment of which it actually or constructively knew; it may discharge its obligation by taking appropriate remedial or preventative action.  *Id.* at 676.  The Tenth Circuit has expressly recognized that a district court may, on summary judgment, determine whether an employer's responses to claims of sexual harassment were reasonable as a matter of law.  *See Holmes v. Utah, Dep't of Workforce Servs.*, 483 F.3d 1057, 1069 (10th Cir. 2007) (citing *Scarberry*, 328 F.3d at 1257) (where the

issue is whether an employer was negligent in allowing co-employees to sexually harass plaintiff, the court may simply examine the record, including the undisputed evidence, to determine whether the employer's responses to claims of sexual harassment were reasonable as a matter of law)).

Significantly, the court need not analyze the reasonableness of UPS's response to Mr. Rojas's harassment from January 2007 through Mr. Rojas's termination in early April 2007 because plaintiff concedes that UPS's response throughout that time period was adequate. According to plaintiff, a reasonable jury could conclude that UPS's response was inadequate because UPS management members of the Mo-Kan panel ultimately agreed to reinstate Mr. Rojas without qualification (such that he was returned to the route adjacent to plaintiff), effectively "undoing everything [positive] it had done up to that point."[6]   After carefully considering plaintiff's argument and the undisputed facts, the court concludes that plaintiff has not come forward with sufficient evidence from which a jury could conclude that UPS's response was inadequate.  On the contrary, the record establishes as a matter of law that UPS's response was prompt, adequate and effective as a matter of law.

Critical to the court's conclusion that defendant's response was reasonable as a matter of law is the undisputed evidence that Mr. Rojas's harassment of plaintiff ceased upon his

---

[6]Plaintiff contends that the decision of the Mo-Kan panel was required to be unanimous such that all UPS management members of the panel necessarily agreed to reinstate plaintiff.  The evidence, however, establishes that only a majority vote (as opposed to unanimity) was required.  Nonetheless, at least one member of UPS management necessarily agreed with the decision to reinstate Mr. Rojas to achieve the requisite majority such that plaintiff's argument is not fatally flawed.

termination and, despite the fact that he was reinstated, Mr. Rojas never again bothered plaintiff in any respect.  Thus, even assuming that the ultimate decision to reinstate Mr. Rojas can be attributed to UPS, UPS's response was nonetheless effective.  As the Circuit has recognized, an employer is not required to terminate an employee upon its conclusion that the employee has engaged in sexual harassment.  *See Scarberry*, 328 F.3d at 1258 ("[I]f we required employers to . . . impose excessive discipline, employers would inevitably face claims from the other direction of violations of due process rights and wrongful termination.").  An employer is only required to respond adequately and effectively.  Mr. Rojas's one-day suspension, while certainly not the result desired by plaintiff, was effective because Mr. Rojas's harassment ceased.  Indeed, plaintiff can point to no evidence indicating that UPS's could have been more effective in any respect.  The demonstrated willingness of on-the-scene management of UPS to seek the ultimate employment sanction against Mr. Rojas, even if it did not stick on this occasion, was certainly a deterrent to him and others from engaging in this type of behavior.

        In the context of analyzing the reasonableness of an employer's response to harassment complaints, the Tenth Circuit has stated that "stoppage of the harassment by the disciplined perpetrator evidences effectiveness" and has noted the significance of this fact.  *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 676 (10th Cir. 1998).  According to the Tenth Circuit, the key to assessing the reasonableness of a response is "asking whether the remedial and preventative action was 'reasonably calculated to end the harassment.'" *Id*. (quoting *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991)).  "A stoppage of harassment shows effectiveness, which in turn

evidences such reasonable calculation." *Id.*[7]  Affirming the district court's grant of summary judgment in favor of Wal-Mart on plaintiff's sexual harassment claim, the Circuit held that the plaintiff "did not bring to the trial court's attention sufficient evidence to establish the essential element for employer liability that Wal-Mart inadequately responded to incidents of harassment of which it knew or should have known." *Id.* at 677.  According to the Circuit, the record showed that Wal-Mart's responses to each incident of which it had actual or constructive knowledge were prompt and either effective as evidenced by a complete stoppage by the disciplined harasser or, in those instances where a complete stoppage was not evident, proportional to the seriousness and frequency of the incidents, and therefore were reasonably calculated to end the harassment. *Id.*

Similarly, in *MacKenzie v. City & County of Denver*, the plaintiff complained to her employer that her supervisor, continuing over the course of 18 months, had subjected her to a hostile work environment based on her age.  414 F.3d 1266, 1270 (10th Cir. 2005).  The employer responded by immediately counseling the supervisor and requiring him to apologize to the plaintiff.  *Id.*  Affirming the district court's grant of summary judgment in favor of the employer on the harassment claim, the Tenth Circuit held that the employer's response was "prompt, adequate and effective as a matter of law" based on the undisputed fact that the supervisor never again made inappropriate comments. *Id.* at 1281.

---

[7]The Circuit continued by delineating other pertinent factors in those cases in which "effectiveness is not readily evidenced by a stoppage." *Id.*  Because a complete stoppage occurred in this case, those additional factors are not pertinent here.

In this case, the record is undisputed that UPS's response had the effect of stopping any further harassment on the part of Mr. Rojas.[8]  The effectiveness of that response, then, indicates without question that it was reasonably calculated to end the harassment.  Summary judgment in favor of defendant is warranted on plaintiff's claim of sexual harassment.


## IV.    Retaliation Claim

Plaintiff also contends that UPS began to retaliate against her after she complained about Mr. Rojas's conduct, including overdispatching plaintiff's route; excessively scrutinizing her work performance; changing the starting time of her shift; supervisors refusing to communicate with her at all or only in the presence of other witnesses; moving the location of her package car next to Mr. Rojas's package car for morning loading purposes; forcing her to attend a meeting with UPS managers during which managers were at times hostile and intimidating; failing to fulfill a promise to push plaintiff's start time back by thirty minutes so that she could avoid seeing Mr. Rojas; attempting to terminate plaintiff's employment after she complained about retaliation by subjecting her to unwarranted disciplinary write-ups; and attempting to deny her approved personal leave.

---

[8]The court leaves open the possibility that a complete stoppage by the disciplined harasser may not, in every case, demonstrate that the response was reasonably calculated to end the harassment.  The Tenth Circuit in *Adler*, for example, noted that evidence that an employer's response stopped the disciplined harasser yet failed to deter future harassers might be relevant.  144 F.3d at 678.  Plaintiff here presents no evidence that anyone other than Mr. Rojas harassed her at any time during her employment with UPS.

A.      *Retaliatory Harassment*

In its motion for summary judgment, defendant addresses these allegedly retaliatory acts only individually and treats each allegedly retaliatory act as a separate and distinct claim of retaliation. Defendant, then, contends that many of the "claims" must be dismissed because they were not the subject of an administrative charge and that those "claims" that were the subject of a charge nonetheless fail because, standing alone, none of the allegedly retaliatory acts is sufficient to rise to the level of a materially adverse action and, in any event, a plausible reason exists for the occurrence of those acts. While the court agrees that plaintiff is attempting to set forth discrete claims with respect to certain retaliatory acts (claims that are discussed below), the court concludes that the pretrial order, plaintiff's brief in opposition to the motion for summary judgment and the record evidence reflect that plaintiff intends to assert a claim of retaliatory harassment based on the aggregate effect of the actions taken against her. Because defendant never addresses the allegedly retaliatory acts in the overall context of a retaliatory harassment claim, the court has some concern that plaintiff's articulation of that theory is not as clear as it might have been. Nonetheless, as will be explained, the court is convinced that such a claim has been articulated and preserved in this case.

Plaintiff filed her first charge of discrimination with the EEOC on May 1, 2007. On that form, plaintiff identified the cause of discrimination as both "sex" and "retaliation" and marked that the discrimination was a "continuing action." While the text of that charge arguably contained only one incident that plaintiff perceived as retaliatory (a sexually vulgar text message from UPS supervisor Phil Hoetzel), plaintiff amended her charge on July 2, 2007 and again

marked that the "retaliation" and "sex" discrimination was "continuing." In the text of her amended charge, plaintiff describes "events of continued harassment retaliation that have occurred." Plaintiff filed her second charge of discrimination on January 23, 2008, again marking that the "retaliation" and "sex" discrimination was "continuing." Like her amended charge, the text of plaintiff's second charge describes "events of continued harassment and retaliation that have occurred" and she identifies, by way of "examples" of "harassment," numerous instances of allegedly retaliatory conduct. As clearly reflected in her administrative charges, then, plaintiff's retaliation claims have encompassed retaliatory harassment from the earliest stages of this case.

While the pretrial order filed in this case admittedly does not expressly identify a retaliatory harassment claim, the retaliation claim identified by plaintiff in the pretrial order in no way limits the claim to discrete acts. In her factual contentions, plaintiff describes her retaliation claim as follows:

> Since plaintiff complained to defendant about Mr. Rojas sexually harassing her, several of defendant's supervisors and managers have become increasingly hostil[e] toward plaintiff and have treated her differently and more harshly than her co-coworkers. While this conduct has not stopped plaintiff from standing up for her rights, such treatment at the hands of management could dissuade reasonable employees from complaining about sexual harassment and making charges of discrimination.

Plaintiff's description of her supervisors as "increasingly hostile" suggests a pattern of ongoing activity indicative of a hostile work environment. Moreover, the elements of plaintiff's retaliation claim as enumerated by plaintiff in the final pretrial order are not inconsistent with what is required to establish a retaliatory harassment claim. In the pretrial order, plaintiff

articulates that she must prove that she engaged in protected opposition to discrimination; that defendant subjected her to conduct that might well have dissuaded a reasonable employee from making a charge of discrimination; and that a causal nexus exists between plaintiff's opposition and defendant's conduct.  These are the same prima facie elements that courts have utilized in the context of analyzing retaliatory harassment claims.  *See, e.g., King v. Interstate Brands Corp.*, 2009 WL 1162206, at *16 (E.D.N.Y. Apr. 29, 2009); *Seybert v. International Group, Inc.*, 2009 WL 722291, at *20 (E.D. Pa. Mar. 17, 2009) (concluding that post-Burlington Northern, a plaintiff claiming retaliatory harassment need not establish harassment that is severe or pervasive but need only show conduct that, taken together, might dissuade a reasonable person from pursuing a charge).  The pretrial order, then, is sufficient to preserve a claim of retaliatory harassment.[9]

Finally, plaintiff's brief in opposition to defendant's motion for summary judgment

---

[9]In its motion, defendant asserts that the court cannot consider any allegedly retaliatory act not specifically alleged in the pretrial order.  The court disagrees.  The pretrial order filed in this case does not employ the level of specificity urged by defendant; indeed, none of the specific retaliatory acts alleged by plaintiff appear in the pretrial order.  Moreover, the purpose of the pretrial order is to prevent unfair surprise and defendant has not suggested that they were unaware of any of plaintiff's specific allegations.

Defendant further argues, in its reply, that the pretrial order expressly limits plaintiff's retaliation claims to those actions taken in response to her complains about Mr. Rojas and not in response to her EEOC filings or the filing of the complaint in this case.  Defendant's construction of the pretrial order is based on the following language: "Since the plaintiff complained to defendant about Mr. Rojas sexually harassing her, several of defendant's supervisor and managers have . . . ."  Defendant incorrectly construes the word "since" to denote cause and effect as opposed to the passage of time.  *The Texas Law Review Manual on Usage & Style* ¶ I:35at 69 (8th ed. 1995).

17

reflects plaintiff's understanding that she is not pursuing only discrete claims of retaliation but also a claim for retaliatory harassment.  In the factual portion of plaintiff's brief, plaintiff's uses descriptive headings such as "UPS Begins to Retaliate Against Plaintiff" and "Diaz Continues to Retaliate Against Plaintiff," suggesting a continuum of retaliatory activity.  In the argument portion of her brief, plaintiff contends that "UPS management embarked on [a] path of retaliatory actions" and that UPS "wanted to make life difficult for Plaintiff."  More directly, plaintiff uses the phrase "retaliatory harassment" at page 52 of her brief to describe UPS's conduct and, on page 54 of her brief, states that a reasonable jury could interpret UPS's "lengthy history" of making plaintiff's "work environment more stressful" as "continuing retaliation against plaintiff."  For these reasons, the court concludes that a claim for retaliatory harassment has been asserted and preserved in this case.

That being said, the court is limited in its ability to analyze the merits of plaintiff's retaliatory harassment claim at this stage because defendant has not addressed the claim.  But viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that plaintiff's laundry list of allegedly retaliatory acts, when considered in the aggregate, rise to the level of a materially adverse action.[10]  Plaintiff has also come forward with sufficient

---

[10]Defendant's argument, presented in the context of plaintiff's discrete claims, that the court cannot consider any acts not included in an administrative charge would not apply in the context of plaintiff's harassment claim because plaintiff's claim clearly encompasses acts that were timely included in a charge of discrimination.  *See Duncan v. Manager, Department of Safety, City & County of Denver*, 397 F.3d 1300, 1308-09 (10th Cir. 2005) (as long as "an act" contributing to a hostile work environment took place no more than 300 days before the plaintiff filed an EEOC charge, a court may consider the complete history of acts comprising that hostile work environment) (citing *National Railroad Passenger Corp. v.*

evidence of retaliatory motive to require a jury trial on her claim. Cheryl Hatton, plaintiff's dispatch supervisor in April and May 2007, avers that Mr. Wolford, after Mr. Rojas's reinstatement, instructed her to "write [plaintiff] up for every little thing and give her warning letters when it wasn't the proper step in progressive discipline."[11] Ms. Hatton further avers that Jamie Diaz, a supervisor, "wanted [her] to hold [plaintiff] accountable for every little number mistake or dispatch mistake" and instructed her to "change dispatch" in a manner that made it impossible for plaintiff to make her deliveries in a timely fashion.

Moreover, plaintiff testified that she questioned Mr. Diaz in June 2007 about why Mr. Rojas was permitted to come back to work and Mr. Diaz told her she needed to "get over it and move on." In addition, plaintiff's evidence reflects Mr. Diaz's concern that his statements kept "winding up on complaints filed by [plaintiff] with government agencies" and that, one week after UPS was served with plaintiff's complaint initiating this lawsuit, Mr. Diaz told her that she was "skating on thin ice" in light of the "trouble [she was] causing outside." Finally, plaintiff's evidence demonstrates that one of UPS's human resources managers, Gary Liberti, raised his voice in frustration with plaintiff during a closed-door meeting in which he was pressing plaintiff for information about her EEOC complaints.

---

*Morgan*, 536 U.S. 101 (2002)).

[11]Defendant contends that the court should strike Ms. Hatton's affidavit because plaintiff failed to supplement its discovery responses to include the affidavit. Without deciding whether plaintiff should have produced the affidavit as part of her continuing obligation to supplement her discovery responses, the court declines to strike the affidavit in the absence of any assertion of prejudice from defendant, particularly as Ms. Hatton was identified by plaintiff as a witness with knowledge early in the discovery process.

For the foregoing reasons, and in the absence of argument from defendant concerning the merits of the claim, the court concludes that plaintiff is entitled to have her retaliatory harassment claim tried by a jury.

### B.    Discrete Claims of Retaliation

In evaluating plaintiff's discrete claims of retaliation, the court considers only those retaliatory acts alleged in plaintiff's administrative charges and, among those acts, only those acts addressed by plaintiff in her summary judgment briefing. *Jones v. UPS, Inc*., 502 F.3d 1176, 1186 (10th Cir. 2007) (each discrete incident of alleged retaliation constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted); *Maestas v. Segura*, 416 F.3d 1182, 1190 n.9 (10th Cir. 2005) (plaintiffs abandoned claims "as evidenced by their failure to seriously address them in their briefs"); *Hinsdale v. City of Liberal, Kansas*, 2001 WL 980781, at * 16-17 (10th Cir. Aug. 28, 2001) (affirming district court's grant of summary judgment in favor of defendant on certain claims after concluding that plaintiff had abandoned those claims by failing to address them in response to the defendant's motion for summary judgment) (citing *Coffey v. Healthtrust, Inc*., 955 F.2d 1388, 1393 (10th Cir. 1992)). The discrete claims of retaliation left for the court's consideration, then, include UPS's decision to change the "start time" for plaintiff's shift; UPS's decision to place plaintiff's package car immediately adjacent to Mr. Rojas's package car in the morning lineup; the September 2007 meeting during which UPS management personnel confronted plaintiff about her retaliation claims; and UPS's failure to follow through on its October 2007 promise to push plaintiff's start

time back so that she could avoid seeing Mr. Rojas in the mornings.[12]

To establish a prima facie claim under Title VII for retaliation, a plaintiff must establish three elements: (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006) (citation omitted). Once the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse action. *Id*. If the employer does so, the burden shifts back to the plaintiff to show that the employer's reasons are pretextual. *Id*. (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1316 (10th Cir. 2006)). If there is reason to believe the employer's reasons are pretextual, the case may be submitted to the jury. *Id*.

Defendant moves for summary judgment on each of plaintiff's discrete claims of retaliation on the grounds that plaintiff cannot establish that a reasonable person would deem the challenged actions "materially adverse"; cannot establish that a causal connection exists between her protected activity and the challenged actions; and cannot establish that UPS's proffered reasons for the actions are pretextual. As will be explained, a jury trial is required on plaintiff's

---

[12]Two allegedly retaliatory acts–an April 2007 text message from Phil Hoetzel and Mr. Diaz's June 2007 "get over it" comment–appear both in plaintiff's charges as well as plaintiff's summary judgment brief but are nonetheless not considered by the court as discrete claims because a careful reading of plaintiff's brief indicates that these acts are described to offer context for subsequent allegedly retaliatory acts rather than to stand alone as separate claims.

claim concerning the May 2007 change in her schedule; summary judgment is granted on all other discrete claims of retaliation as the record evidence is insufficient to permit a jury to conclude that the challenged actions are materially adverse.

1.     Materially Adverse

An employer's actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006)).   "[W]hile the standard is sensitive to the particular circumstances of each case, it prescribes an objective inquiry that does not turn on a plaintiff's personal feelings about those circumstances."   *Id.* (citing *Burlington Northern*, 548 U.S. at 68-69).  Each case is "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."   *Id.* (quoting *Burlington Northern*, 548 U.S. at 71).

As a threshold matter, defendant contends that none of the challenged actions can be considered materially adverse because the actions did not, in fact, dissuade a charge of discrimination.  In support of this argument, defendant relies on two unpublished opinions from the Circuit Courts of Appeals–*Bush v. Regis Corp.*, 2007 WL 4230693, at *3 (11th Cir. Dec. 3, 2007) and *DeHart v. Baker Hughes Oilfield Operations, Inc.*, 2007 WL 126081, at *3 (5th Cir. Jan. 19, 2007).  In both decisions, the Courts of Appeals determined that the plaintiff had not shown that the challenged action might dissuade a reasonable employee from filing a charge in part because the plaintiff had not been deterred from filing a charge of discrimination.

As plaintiff aptly points out, however, every plaintiff asserting a claim of retaliation has, by virtue of Title VII's exhaustion requirements, necessarily filed a charge of discrimination concerning the allegedly retaliatory act. To suggest, then, that a plaintiff's filing of a charge of discrimination precludes a finding that a reasonable person might be dissuaded from filing a charge of discrimination defies logic. While the court leaves open the possibility that circumstances might exist in which a particular plaintiff's pursuit of his or her remedies might be relevant to a finding of whether a challenged action is materially adverse, *see Somoza v. University of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008) (stating, in dicta, without citation, that "the fact that an employee continues to be undeterred in his or her pursuit of a remedy . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable"), defendant has not persuaded the court that those circumstances are present here.

Plaintiff's first claim is based on UPS's decision, in May 2007, to change plaintiff's start time from 8:50am to 8:40am, rendering it difficult for plaintiff to take her children to school and still arrive at work on time. By way of background, Keith Wolford had agreed in September 2006 to permit plaintiff to start her shift at 8:50am after plaintiff advised him that she was having a difficult time, as a newly single parent, taking her children to school and getting to work in time to begin her shift at 8:40am. For nine months, then, UPS permitted plaintiff to begin her shift at 8:50am to accommodate plaintiff's child care concerns. On May 6, 2007, Mr. Wolford advised plaintiff that he could no longer honor that agreement. The record reflects that Mr. Wolford changed plaintiff's start time after he discussed the issue with Jamie Diaz, UPS's Division Manager at the James Street facility.

23

In *Burlington Northern*, the Supreme Court explained that "context matters" in evaluating the significance of a challenged act of retaliation and, by way of example, stated that a "schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." 548 U.S. at 69. In *Washington v. Illinois Department of Revenue*–the case cited by the Supreme Court for its example–the Seventh Circuit explained that a plaintiff can establish a materially adverse action with evidence that his or her employer set out to "exploit a known vulnerability" (in that case, a working mother's need for a flex-time schedule in order to care for her disabled son) in a way that causes an actionable loss. 420 F.3d 658, 662-63 (7th Cir. 2005). Plaintiff has presented evidence that her supervisor knew about her struggle as a single parent to both get her children to school and arrive at work in a timely fashion such that the 8:40am start time would impose a hardship on plaintiff. While a reasonable jury could certainly conclude that the schedule change would not dissuade a reasonable worker from pursuing a charge of discrimination, plaintiff is at least entitled to have a jury resolve the issue.

With respect to the remaining challenged actions, no reasonable jury could conclude, based on the record evidence, that those actions might well dissuade a reasonable worker from making or supporting a charge of discrimination. Plaintiff contends that a jury could find that UPS's decision to place plaintiff's package car next to Mr. Rojas's package car for purposes of the morning lineup was materially adverse because the decision required plaintiff and Mr. Rojas to be in proximity to one another, which in turn was stressful on plaintiff because of Mr. Rojas's history of sexually harassing her. Similarly, she contends that a jury could find that UPS's

failure to fulfill its promise of pushing back her start time by thirty minutes was materially adverse because she was then required to see Mr. Rojas in the morning, while a delay in her start time would have spared her the discomfort of seeing him.

The court cannot agree that these actions are materially adverse for purposes of establishing a retaliation claim under Title VII. Significantly, plaintiff concedes that Mr. Rojas had no inappropriate contact with her after his reinstatement. Indeed, there is no evidence that she and Mr. Rojas had any communication whatsoever after Mr. Rojas's reinstatement. Moreover, there is no evidence that the challenged actions required plaintiff to be alone with Mr. Rojas or even in close quarters with Mr. Rojas. In the absence of evidence that something other than the mere presence of Mr. Rojas made plaintiff uncomfortable, no reasonable jury could conclude that UPS's actions might well dissuade a reasonable worker from pursuing a charge of discrimination. *Smith v. Jackson*, 539 F. Supp. 2d 116, 141-42 (D.D.C. 2008) (no materially adverse action based on plaintiff's "dissatisfaction" at having to work in physical proximity to alleged harasser where plaintiff was not required to have direct contact with alleged harasser). Summary judgment, then, is granted with respect to plaintiff's retaliation claims concerning the placement of her package car and the failure to push back her start time.

With respect to the September 2007 meeting with various members of UPS management, plaintiff asserts that a reasonable jury could conclude that UPS, by forcing plaintiff to attend the meeting in which UPS management personnel were at times hostile and intimidating, subjected plaintiff to a materially adverse action. The court disagrees. While plaintiff has come forward with evidence that Mr. Liberti questioned plaintiff about her retaliation claims, raised his voice

to plaintiff during the meeting and referenced plaintiff's "stupid lawyer," this evidence is insufficient to demonstrate that a reasonable employee might be dissuaded from pursuing a charge of discrimination. *Mickelson v. new York Life Ins. Co.*, 460 F.3d 1304, 1309, 1318 (10th Cir. 2006) (no materially adverse action based on meeting with three members of management in which supervisor became "extremely angry"); *see also Breneisen v. Motorola, Inc.*, 512 F.3d 972, 981-82 (7th Cir. 2008) (no materially adverse action based on meetings with supervisor in which supervisor questioned reasons for excessive FMLA leave and criticized plaintiff for taking leave); *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 787 (8th Cir. 2007) (no materially adverse action based on meeting with supervisor even though meeting was "undoubtedly uncomfortable" for plaintiff); *Ahern v. Shinseki*, 2009 WL 1615402, at *6 (D.R.I. June 9, 2009) (no materially adverse action based on required, regular meetings with supervisor in which plaintiff was "berated"); *Nolan v. Swartz Campbell, LLC*, 2008 WL 598291, at *20 (W.D. Pa. Feb. 29, 2008) (no materially adverse action based on meeting with supervisor in which plaintiff felt apprehension and intimidated); *Nagle v. RMA, The Risk Mgmt. Ass'n.*, 513 F. Supp. 2d 383, 391 (E.D. Pa. 2007) (no materially adverse action based on "heated" meeting with supevisor which left plaintiff suffering from emotional distress).  Summary judgment, then, is granted with respect to plaintiff's retaliation claim based on the September 2007 meeting.

2.     Causal Connection/Pretext

The court turns, then, to defendant's remaining arguments concerning plaintiff's claim that UPS changed her start time in May 2007 in retaliation for her engaging in protected activity.

Defendant contends that plaintiff cannot establish the requisite causal connection between her protected activity and UPS's decision to change her start time and, in any event, cannot show that UPS's nondiscriminatory reasons for changing her start time are pretextual. The court disagrees and concludes that plaintiff has come forward with sufficient evidence to justify an inference of retaliatory motive on the part of UPS and sufficient evidence of pretext.

The evidence reveals that Mssrs. Wolford and Diaz are responsible for changing plaintiff's start time in May 2007–a change that occurred within two months of the complaint that led to Mr. Rojas's termination and within two weeks of Mr. Rojas's reinstatement.[13] The record reflects that Mr. Wolford and Mr. Diaz, during this same time frame, may have been looking for reasons to either terminate plaintiff's employment or cause her to quit her employment. As noted above, Cheryl Hatton has averred that Mr. Wolford, after Mr. Rojas's reinstatement, instructed her to "write [plaintiff] up for every little thing and give her warning letters when it wasn't the proper step in progressive discipline." Ms. Hatton further avers that Mr. Diaz "wanted [her] to hold [plaintiff] accountable for every little number mistake or dispatch mistake" and instructed her to "change dispatch" in a manner that made it impossible for plaintiff to make her deliveries in a timely fashion. During this same time frame, Mr. Diaz allegedly told plaintiff to "get over" the situation with Mr. Rojas and "move on." This evidence, while perhaps not overwhelming, is sufficient to permit a reasonable jury to find the requisite causal connection

_____

[13]The change in plaintiff's schedule occurred just one week after plaintiff's May 1, 2007 charge of discrimination but neither party discusses the connection, if any, between these events.

between plaintiff's protected activity and the May 2007 change in plaintiff's schedule.

With respect to pretext, defendant contends that the record is devoid of evidence suggesting that its proffered reason for changing plaintiff's schedule lacks credence. According to defendant, UPS decided to revert plaintiff's schedule to the 8:40am start time because it was unfair to permit plaintiff to start her shift at a time different from the specific start time bid for that route (stated another way, that it was unfair not to hold plaintiff to the contractual start time) and because the placement of plaintiff's vehicle in the building required that she leave earlier than 8:50am. But the evidence reflects that these circumstances (i.e., she had not bid for an 8:50am start time and the specific placement of her vehicle in the building) existed both at the time UPS agreed to permit plaintiff to begin her shift at 8:50am and for the next nine months. In the absence of evidence explaining why these circumstances suddenly became significant in May 2007, a reasonable jury could conclude that UPS manufactured these reasons as an excuse to change plaintiff's start time in retaliation for her protected activity. For the foregoing reasons, a trial is required on plaintiff's retaliation claim based on the May 2007 change in plaintiff's schedule.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc.47) is granted in part and denied in part.

**IT IS SO ORDERED.**

28

Dated this 21st day of July, 2009, at Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge